[No. A089623. First Dist., Div. Three. Apr. 30, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
CLEMETH RAY CASTILLE et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication only through part I of the Discussion.

## Counsel

Robert Joseph Beles and Paul McCarthy for Defendant and Appellant Clemeth Ray Castille.

Stephen Michael Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant Remon Shields.

Bill Lockyer, Attorney General, Christina Vom Saal and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CORRIGAN, Acting P. J.**—In this case three defendants were tried together for murder with special circumstances and attendant enhancements. After their arrests, all three defendants were questioned in a joint interview. In the published portion of this opinion we hold that the statements made by each defendant were properly admitted against him and the other two codefendants pursuant to firmly rooted hearsay exceptions.

### Factual and Procedural Background

Remon Shields, and Clemeth Ray Castille, both 17 years old, and Robert Brown, age 18, decided to rob Sharif's Market in Oakland.[1] Shields collected two sawed-off shotguns from the basement of his grandmother's house: a single-shot .16-gauge Winchester and a pump-action .12-gauge Mossberg. He wrapped the guns in a dark shirt and brought them to Brown's car. Brown drove all three to the market.

At Shields's direction, Brown made a U-turn in front of the market and parked about 15 feet from the front door. Shields and Castille got out of the car. They wore ski masks and pulled hoods over their heads. As both men entered the store, Shields handed Castille the .16-gauge shotgun that fired pellets. Shields carried the .12-gauge Mossberg that fired a slug. Brown

---

[1] Portions of the statement of facts are based on the transcript of defendants' taped joint statement.

remained in the car. Inside the market, Abdo Nashar stood behind the counter near the cash register. Nabil Abdullah was checking a display at the front counter and owner Ibrahim Sharif El-Din was in an upstairs apartment.

Appellants had agreed that Shields would approach the clerk and Castille would act as "back-up." However, Castille entered the store first and approached Nashar at the register. Shields followed and stood guard at the door, about six to eight feet from the counter. Abdullah heard Castille say something to Nashar, after which Nashar grabbed the gun and struggled with Castille. Frightened, Abdullah began to back away, telling Nashar to give Castille the money. Abdullah saw Shields pointing his shotgun into the interior of the store. As he hid behind a refrigerator, Abdullah heard two shots, six or seven seconds apart. He looked out to see Nashar lying behind the cash register, bleeding. Nashar died from a gunshot wound to the left side of his head and neck.

In the apartment above the store, Sharif El-Din loaded his handgun after hearing the second shot. He looked out the window and saw a brown car parked near the store with the passenger-side door open. He heard someone inside the car ask, "Did you kill him?" and heard another person yell, "Go! Go! Go!" Leaning from his window, El-Din fired four to five shots as the car drove away.

The shotguns were kept at Castille's house for several weeks until Brown and Castille gave them to a friend to sell. The friend alerted police and the guns were recovered. A firearms expert opined that wadding found on the floor of the market and an expended shell casing found in the front of the store came from the .12-gauge Mossberg that Shields had carried into the business. Once the Mossberg was loaded, the weapon had to be pumped to chamber a cartridge. The pump had to be employed again after firing to eject the shell. Approximately five pounds of pressure were required to pull the trigger on the Mossberg. A large-caliber expended slug was recovered from the wall five feet behind the cash register. It appeared to have passed through a plexiglass display. The holes in the plexiglass and wall were closely aligned. The hole in the wall was located four feet 10 inches from the floor. The victim was five feet three inches tall. The path of the wound was towards the right side of his body, going downward at a 30-degree angle. The autopsy surgeon testified that the victim's wound was consistent with having been caused by a slug, rather than shotgun pellets. Shotgun pellets were found next to and inside the cash register.

About a month after the shooting, police saw defendant Brown's car and noted possible gunshot holes in the rear fender. Shields, Castille and Brown

were arrested a week later and each was interviewed separately. Each waived his Fifth Amendment rights after a proper *Miranda*[2] admonition. When the individual statements were completed, all three were brought together and a joint interview was conducted. The tape recording of the joint interview was played for the jury. Defendants did not testify and their individual statements were not offered.

During the joint interview, Shields claimed that after he and Castille entered the store, he urged Castille to leave but that Nashar grabbed Castille's gun. Nashar and Castille struggled and the gun went off. Castille stated that he ducked out of the way as Shields pointed his gun at Nashar and fired. Although acknowledging that Castille's account of the shooting was "probably" true, Shields nevertheless maintained that his shotgun discharged accidentally, when he bumped his arm against the door as he fled. Castille ran out of the store and jumped into Brown's car. Shields followed after retrieving Castille's gun from the floor of the market. When Shields got into Brown's car, he yelled at Castille, "Damn Clemeth, why'd you do that, why'd you do that?"

The jury convicted Shields and Castille of first degree murder with the special circumstance that the murder occurred during the attempted commission of a robbery. The jury also found that Shields and Castille each used a firearm during the crime. Brown was convicted of the lesser offense of being an accessory, armed with a firearm. Shields and Castille were sentenced to life in prison without possibility of parole, plus 10 years for the firearm enhancements. Brown, who was sentenced to four years in prison, does not appeal. We use the collective term "defendants" to refer to Shields, Castille and Brown. The term "appellants" refers to Shields and Castille.

## DISCUSSION

### I. *Admissibility of Joint Interview Statement*

Before trial, the prosecutor indicated he would offer the joint statement as evidence. Defendants objected and, in the alternative, sought separate trials. As we explain below, the court properly admitted the hearsay statements against each appellant in a joint trial.

### A. *The Joint Interview Background*

The interview was conducted under the direction of Lieutenant Ralph Lacer. Lacer was aware of the general rule that the statement of one

---

[2]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

defendant is inadmissible against another when they are tried together before the same jury. (*Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476]; *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) He had become aware of a joint interview technique and decided to employ it during this investigation. Lacer met together with four homicide investigators and all three suspects, less than two hours after completion of their individual interviews. Lacer confirmed that each defendant had been given a *Miranda* admonition, agreed to speak to an investigator and was currently aware of his Fifth Amendment protections. The defendants were then questioned together. During the interview, Lacer or one of the other officers asked the defendants to recount some aspect of the crime. Once a statement or series of statements was made by one of them, the officer would turn to the other defendants and ask each of them in turn whether what the original speaker had said was true. In the vast majority of instances, each of the others confirmed that the original statements were accurate. Occasionally, one of the defendants would reply that he did not remember a particular detail. In one instance, as we explain below, Shields gave an equivocal reply when asked if something Castille said was accurate. On separate occasions, Shields and Castille each corrected or augmented a statement by Lacer, when Lacer was relating his understanding of what had taken place.

Several methods were used to include all three defendants in the discussion. The officers frequently began their questions on a particular topic by addressing one defendant and then continuing the account with another. As one defendant gave information, the officers asked the others to confirm certain statements. For example, Brown, who was driving, said he thought Shields told him to make a U-turn in front of the store. Shields was then asked if Brown turned around when Shields told him to do so and Shields said, "Yeah." Then Castille was asked, "Is that what you remember. That you made a [U]-turn in front of the store after uh Remon[3] said, turn around?" Castille replied, "Yes." The officer went on to ask Castille where he was sitting and what he did after the car was parked. Castille explained that he. got out of the front seat of the car and covered his head. Shields was then asked if he also covered his head and he confirmed that he did so. Brown was asked whether both Castille and Shields put their hoods up, and he replied affirmatively. Shields had earlier explained that he gave one of the guns to Castille. The officer asked Shields, "[W]as this the time in which you gave uh Clemeth his gun?" Shields answered, "Yes." The officer then asked, "Clemeth, you took the gun from Remon at that point? Castille

---

[3]The transcript contains a number of misspellings, including the names of both appellants. We use the correct spelling of their names in those excerpts we quote. In all other instances we set out the correct spelling of a word in brackets.

answered yes, and the officer turned to Brown and asked, "Okay now Robert, what did you do? Did you stay in the car?" After Brown replied affirmatively, Lacer asked about the guns that were used, asking Shields to describe the gun he gave to Castille. When Shields stated that it was a .16-gauge, Lacer asked Castille, "And, Mr. Castille, is that correct, is that the kind of gun you got?" Castille replied, "Yes."

At certain times in the interview, the same question was asked of each defendant. At other times, questions were elicited from one defendant when the information related solely or principally to that defendant. For example, Shields was asked to describe events inside the market following the clerk's shooting, when Shields was the only defendant in the store. Castille, who later concealed the guns at his house, was asked a series of questions about their location.

Finally, at the conclusion of the interview, each defendant was asked if he wanted to add anything. Brown and Castille declined the opportunity. Shields added his apology to "the wife, and to the baby kids" and said that if there was anything he could do to change what had happened, he would. Each defendant was also asked whether he agreed with everything that had been discussed in the interview. Castille was asked "[D]id you understand everything we talked about here, and do you agree with everything we talked about?" Castille answered, "Yes." Shields was asked, "[D]o you . . . understand and agree with . . . everything we have talked about here?" Shields answered, "Yes." Brown was asked the same questions and answered affirmatively.

During this process, Shields either stated himself, or agreed with the statement of someone else relating the following facts. Shields, Castille and Brown talked about robbing the business. Shields retrieved the shotguns, loaded them and placed them in Brown's car. Shields drove with Castille and Brown to the location, directing Brown to make a U-turn in front of the market. Shields, wearing a ski mask, pulled his jacket hood over his head before entering the store, and gave one of the shotguns to Castille. Shields originally intended to enter first and demand money, but Castille went in ahead and approached the clerk. Shields followed. After watching Castille and the clerk struggle over Castille's gun, Shields told Castille to "come on." As Castille left the market, Shields's gun discharged, killing the clerk. Shields retrieved both guns from the store, threw them into Brown's car and fled with Brown and Castille.

Likewise, Castille either stated himself, or agreed with the statement of someone else as follows. Along with Shields and Brown, Castille planned to

rob the market. Castille got out of the car wearing a ski mask and pulled his jacket hood over his head. He took the shotgun from Shields, entered the store, and approached the clerk. The clerk grabbed Castille's shotgun, which may have fired. Castille let go of the gun and it fell to the floor. Castille turned and saw Shields pointing his shotgun at the clerk. Fearing he might be shot, Castille ducked and ran from the store. He fled from the scene with Shields and Brown and hid the guns. Several weeks later he and Brown gave the guns to a friend to sell.

Each defendant objected to the admission of the statements of another as evidence against him. They argued that to allow the jury to hear these statements deprived them of their rights to confront and cross-examine witnesses and that the statements did not fall under any hearsay exception. The trial court properly rejected these objections.

### 1. *Analysis*

The Sixth Amendment's confrontation clause, made applicable to the states through the Fourteenth Amendment (*Pointer v. Texas* (1965) 380 U.S. 400, 403-405 [85 S.Ct. 1065, 1067-1069, 13 L.Ed.2d 923]) provides: "[I]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." ■ The confrontation clause requires that in order to introduce a relevant statement at trial, the prosecutor must produce the declarant of the statement or show his or her unavailability. If unavailability has been demonstrated, the proffered statement, which is hearsay, must bear adequate "indicia of reliability." (*Ohio v. Roberts* (1980) 448 U.S. 56, 65-66 [100 S.Ct. 2531, 2538-2539, 65 L.Ed.2d 597].) The Supreme Court explained: "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Id.* at p. 66 [100 S.Ct. at p. 2539], fn. omitted.)

"Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." (*Idaho v. Wright* (1990) 497 U.S. 805, 817 [110 S.Ct. 3139, 3147, 111 L.Ed.2d 638].)

### *Applicable Hearsay Exceptions*

■ The statements at issue fall under two firmly established and closely related exceptions to the hearsay rule: statements of a party and adoptive admissions.

The statement of a party[4] is the most straightforward of the hearsay exceptions. Simply stated, and as a general rule, if a party to a proceeding has made an out-of-court statement that is relevant and not excludable under Evidence Code section 352, the statement is admissible against that party declarant.[5] As relevant here, the exception contains two important limitations. First, the statement must be offered by a party opposing the party declarant. Second, the statement is only admissible against the party who actually made it. ■ Thus neither Shields nor Castille can successfully object to the admission of their own statements against them. This exception would not serve, however, to allow a statement of Shields to be admitted against Castille or vice versa.

■ The adoptive admissions exception[6] generally permits hearsay to be admitted against a party, when that party has adopted or agreed that a statement originally made by someone else is true.[7] The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct. "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) ■ Here the interview tape reveals that virtually all statements made by one defendant implicating either or both appellants were adopted by those appellants as true. Thus, those statements were admissible under section 1221.

■ Admissibility of an adoptive admission is appropriate when " 'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998

---

[4]Evidence Code section 1220 provides in part: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity. . . ." This exception is sometimes referred to as a "party admission." (See, e.g., 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, §§ 90-92, pp. 793-796; Simons, Cal. Evidence Manual 2002-2003 Edition (2002) § 2.28, pp. 74-77.) The text of the code section does not use that designation, however, and we decline to use it here. Referring to the exception as a "party admission" invites confusion because it may inaccurately imply that the statement must have been against the declarant's interest.

[5]We do not further consider other possible bases for exclusion involving problems with privileges, double hearsay, speculation and the like, that are not involved here.

[6]Evidence Code section 1221.

[7]Again, we do not further consider other possible reasons for exclusion not raised by the facts here.

P.2d 969], quoting *People v. Preston* (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300].) "There are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief* in, the truth of such hearsay statement.' [Citation.]" (*People v. Silva* (1988) 45 Cal.3d 604, 623 [247 Cal.Rptr. 573, 754 P.2d 1070].) The analytical basis for this exception is that the adopting party makes the statement his own by admitting its truth. The statement or conduct of the adopting party thus expresses the same statement made by the declarant. (See 1 Witkin, Cal. Evidence, *supra*, Hearsay, § 102, p. 805.)

█ Contrary to appellants' assertion, there is no reason for a blanket rule against the application of an adoptive admission analysis to statements made in a custodial setting. No California or United States Supreme Court case has articulated such a rule. Appellants cite *People v. Bennett* (1953) 413 Ill. 601, 609 [110 N.E.2d 175, 178], in which the Illinois court of appeal concluded that "surrounded as the defendant was by officers of law . . . it does not seem that under such condition an admission may be implied from [defendant's] silence." We express no opinion on the reasoning in *Bennett* other than to note it is inapposite. Appellants fail to acknowledge a significant distinction between the facts in *Bennett* and their own circumstances. Here, appellants' adoptions were not inferred from their silence. Rather, appellants specifically acknowledged the truth of the incriminating statements. Such statements made while in custody are not uncommon. A properly admonished custodial suspect who waives his Fifth Amendment privilege may be interrogated. (*Miranda v. Arizona, supra,* 384 U.S. 436.) If an officer asks the suspect, "You killed Jones, didn't you?" and the suspect replies, "Yes," then the suspect's affirmation is an admission, adopting the truth of the officer's accusation.

It is true that, particularly after a *Miranda* admonition has been given, a defendant's silence in the face of an accusation may be difficult to classify. The silence may reflect adoption or it may signify an invocation of the right to silence. In *People v. Medina* (1990) 51 Cal.3d 870, 891 [274 Cal.Rptr. 849, 799 P.2d 1282], the Supreme Court recognized that "the use of the adoptive admissions rule may be unwarranted in some situations, including *some* custodial interrogations." (Italics added.) These defendants, however, were not silent in the face of accusations. As noted, each defendant was asked directly whether he agreed with statements made by the others and each had the further opportunity to clarify any statements to which he took exception.

Shields argues that an adoptive admission theory is not appropriate when the defendants' accounts differed on material points. During the joint interview, Shields stated that as he turned to leave the market, holding the gun in

one hand, he hit his arm on the door and the gun went off. On appeal, he cites Castille's contradictory statement that Shields pointed his gun at the clerk and fired. The applicable portion of the joint interview is as follows:

"[LT. LACER:] Okay so that's the distance of about 7 feet.

"[CASTILLE:] Yeah and like I was like right here and then . . . the clerk dude had the gun and everything. [Remon] was like come on, so I let the gun go. I look at Remon and I see the gun pointing right at me so I'm like dang, if he pull the trigger it's going to hit me in my head. So I ducked and ran out the store. As soon as I ducked, the shot went off.

"[LT. LACER:] Was he holding the gun with one or two hands?

"[CASTILLE:] Two hands.

"[LT. LACER:] Two hands? He had the rifle up by his face, the shotgun up by his face aiming. Was there any question in your mind which direction he was aiming it?

"[CASTILLE:] I just looked up and seen it.

"[LT. LACER:] Which, which direction was he aiming?

"[CASTILLE:] Like pointing towards, pointing towards me and the clerk.

"[SGT.] BINGHAM: Okay Remon, you just heard what he said.

"SHIELDS: Yes.

"[LT. LACER:] Is what he said true? Remon, I know it's hard but you need to answer me son. Is what Clemeth just said true?

"[SHIELDS:] If he say it's true, it's true.

"[LT. LACER:] If he says it's true, it's true. That's your answer?

"[SHIELDS:] I know. You know, I don't know for a fact though, I probably did, but I know when I went to turn and walk out the store the gun went off. I know that. I know that. I can remember that. I, I won't ever forget that."

Shields did not deny Castille's account. He acknowledged it reluctantly, but maintained his version of the accidental shooting. At best, Shields's

response is equivocal. "[B]oth the accusatory statement and . . . equivocation may be offered as an implied or adoptive admission of guilt." (*People v. Preston, supra,* 9 Cal.3d at p. 314.) Using the pattern instruction,[8] the court properly informed the jury that a defendant's conduct in the face of an accusation could be considered as an admission if the jury concluded that the foundational requirements, italicized in footnote 8 below, had been met, and that the jury found that defendant's conduct indicated an admission that the accusatory statement was true. Following this instruction, the jury would have disregarded the accusation if it found Shields had not made an admission. In such a circumstance, Shields would have suffered no prejudice. If, however, the jury concluded that Shields's response did constitute an admission, the jury properly considered his admission in weighing the evidence against him.

Shields also refers to his statement, "I knew deep down in my heart at some point we was going to turn back . . . ." He points out that Castille and Brown "said nothing about this." Their failure to comment is not surprising. They could not have known about Shields's purported yet unexpressed belief. Further, neither defendant contradicted Shields. Castille and Brown simply did not address the issue, raising no material discrepancy. Finally, Shields's statement about turning back was admitted without limitation. Thus the jury was free to consider it for its truth and to evaluate whether Shields did, in fact, adopt the statements of the others.

Additionally, Shields points out that the defendants have different recollections about when the robbery was first discussed and who initiated the idea. Shields also said he did not recall removing the guns from Brown's car or later bringing them to Castille's home. None of these differences in recollection are material in light of appellants' admissions regarding the attempted robbery and murder.

---

[8]The jury was instructed as follows: "If you should find from the evidence that there was an occasion when a defendant, *one, under conditions which reasonably afforded him an opportunity to reply, two, failed to make a denial or made false, evasive or contradictory statements in the face of an accusation expressed directly to him or in his presence, charging him with the crime for which the defendant is now on trial or tending to connect him with its commission; three, he heard the accusation and understood its nature,* then the circumstances of the silence and/or conduct on that occasion may be considered against him as indicating an admission that the accusation thus made is true. [¶] Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and/or conduct of the accused in the face of it. Unless you find that the defendant's silence and/or conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement." (CALJIC No. 2.71.5 (6th ed. 1996), italics added.)

### 2. Adoptive Admissions as Firmly Rooted Exceptions to the Hearsay Rule

Alternatively, appellants argue that even if the joint interview qualifies as an adoptive admission, the particular nature of this adoptive admission is not a firmly rooted hearsay exception for Sixth Amendment purposes. They rely for this argument on *Lilly v. Virginia* (1999) 527 U.S. 116 [119 S.Ct. 1887, 144 L.Ed.2d 117] (*Lilly*). *Lilly* is a plurality opinion that stands for the principle that, to satisfy the confrontation clause, evidence admitted against a criminal defendant must either come " 'within a firmly rooted hearsay exception' " or have such " 'particularized guarantees of trustworthiness' " that "adversarial testing would be expected to add little, if anything, to the statement['s] reliability." (*Id.* at pp. 124-125 [119 S.Ct. at p. 1894], quoting *Ohio v. Roberts, supra*, 448 U.S. at p. 66 [100 S.Ct. at p. 2539].) In other words, the statements must be so reliable that the safeguards of confrontation and cross-examination may constitutionally be dispensed with.

*Lilly* did not involve adoptive admissions but rather statements against penal interest. The distinction is important. Lilly was accused of robbery, burglary and a carjacking in which the victim was killed. The police obtained a confession from an accomplice who, although implicating himself in the burglary and robbery, told police that Lilly instigated the carjacking. Although admitting he was present, the accomplice denied any involvement in the murder and claimed that Lilly shot the victim. (*Lilly, supra*, 527 U.S. at p. 121 [119 S.Ct. at pp. 1892-1893].) Lilly was tried alone for murder and related charges. The trial court ruled that the accomplice's statements were declarations against penal interest and admitted them against Lilly. (*Id.* at pp. 121-122 [119 S.Ct. at pp. 1892-1893].) The Supreme Court reversed.

The plurality explained that, "due to the sweeping scope of the label, the simple categorization of a statement as a ' "declaration against penal inter-est" ' . . . defines too large a class for meaningful Confrontation Clause analysis.' [Citation.]" (*Lilly, supra*, 527 U.S. at p. 127 [119 S.Ct. at p. 1895].) The court divided the exception into three categories, based on the manner in which statements against penal interest are offered as evidence in criminal trials: "(1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." (*Ibid.*)

Noting that *Lilly* involved the third category, the plurality concluded: "The decisive fact, which we make explicit today, is that accomplices' confessions

that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." (*Lilly, supra,* 527 U.S at p. 134 [119 S.Ct. at p. 1899], fn. omitted.) The plurality reasoned that "when an alleged accomplice testifies, his confession that 'incriminate[s] himself together with defendant . . . ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses.' [Citation.]" (*Id.* at p. 131 [119 S.Ct. at p. 1897].) "It is clear that our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability.' [Citation.]" (*Id.* at p. 133 [119 S.Ct. at p. 1898].)

The Supreme Court's ruling is consistent with the analytical basis for the exception. The exception rests on the theory that, generally, a person does not make statements that are against his own interest. (1 Witkin, Cal. Evidence, *supra,* Hearsay, § 146, p. 857.) Thus, if he does so, his statements are reasonably considered to be reliable when offered against him. That presupposition does not carry over to statements made against the interest of someone else. For example, A's statement that A and B robbed a store is against A's interest to the extent that it acknowledges that A committed a robbery. A's statement that B also robbed the store is not necessarily against A's penal interest. In fact, giving the police such information, even if it is false, may greatly advance A's interest at B's expense. (See *Lilly, supra,* 527 U.S. at p. 131 [119 S.Ct. at p. 1897].)

Relying on *Lilly,* appellants argue that adoptive admissions made in a custodial setting and inculpating an accomplice do not fall within a firmly rooted hearsay exception. Because appellants ignore the distinction between statements against interest and adoptive admissions, their efforts to analogize their circumstances to those of *Lilly* fail. In *Lilly* the *accomplice's* statement was used against Lilly. Here, however, *appellants* made incriminating admissions, both in their own direct statements and by acknowledging the truth of their co-participants' statements. As explained in *People v. Silva,* "[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions,* and are admissible on that basis as a well-recognized exception to the hearsay rule. [Citation.]" (*People v. Silva, supra,* 45 Cal. 3d at p. 624, italics in original.) The jury was properly instructed with CALJIC No. 2.71.5, providing in part: "Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the . . . conduct of the accused in the face of it." It was

not Castille's statement that was admitted against Shields. Rather, it was Shields's own admission that the statement was true that constituted the evidence against him.

Appellants participated in a joint interview after each had waived his right to remain silent. In the presence of each other, appellants responded to the questions of the interrogating officers. They confirmed the accuracy of the others' statements and, on occasion, corrected and clarified facts. Significantly, at the conclusion of the joint interview, each expressly adopted the truth of the joint statement. These admissions are fundamentally different from the declarations against penal interest described in *Lilly*, where " 'one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another . . . .' [Citation.]" (*Lilly*, *supra*, 527 U.S. at p. 132 [119 S.Ct. at p. 1897].)

The adoptive admissions at issue in this case fall within a firmly rooted exception to the hearsay rule, and there was no confrontation clause violation. "Being deemed the *defendant's own admissions*, we are no longer concerned with the veracity or credibility of the original declarant. Accordingly, no confrontation right is impinged when those statements are admitted as adoptive admissions without providing for cross-examination of the declarant." (*People v. Silva*, *supra*, 45 Cal.3d at p. 624, italics added.) As the *Lilly* court noted, "[V]oluntary admissions of the declarant . . . are routinely offered into evidence against the maker of the statement and carry a distinguished heritage confirming their admissibility when so used." (*Lilly*, *supra*, 527 U.S. at p. 127 [119 S.Ct. at p. 1895].) Moreover, a defendant against whom such a statement is offered has the right and opportunity to challenge that he made the admissions by confronting and cross-examining any witness who testifies that he did so. As noted, the jury was properly instructed not to consider evidence of an accusation against a defendant unless it concluded that defendant admitted its truth.

Finally, because the joint statement was admitted pursuant to a firmly rooted hearsay exception, it was not incumbent upon the trial court to determine whether the joint statement bore additional guarantees of trustworthiness. (*Ohio v. Roberts*, *supra*, 448 U.S. at p. 66 [100 S.Ct. at p. 2539].) We note, however, that the circumstances here do provide such additional guarantees because each appellant was repeatedly asked if he agreed with the statements made by the others, was given the opportunity to correct statements at the time they were made, was given the chance to make his own statements, and was asked both whether he had anything to add and whether he agreed with the statements once the entire interview was concluded. The jury also heard the tape recording of the joint interview and thus was able to

hear the exact statements as they were made, each defendant's response to questions about the others' statements, and the pace and tone of the questions and answers. By citing these factors, we do not suggest that any or all of these particular circumstances must, necessarily, be present to guarantee trustworthiness. Each case must be evaluated on its own facts.

### B. *The Individual Interviews*

Appellants claim the joint interview was obtained by exploiting the illegality of their earlier individual statements. Both Shields and Castille contend that their individual interviews were coerced and thus involuntary. Shields claims officers violated his Fifth Amendment rights by ignoring his invocation of the right to silence during the interview. Appellants also claim their statements were involuntary and inadmissible because the interviewing officers failed to comply with the requirements of Welfare and Institutions Code section 627. Appellants' claims fail.

#### 1. *Background*

##### a. *Shields's Statement*

Sergeant Clark, who interviewed Shields with Sergeant Bingham, testified at the hearing on the voluntariness of Shields's individual statement. Clark stated that Shields waived his *Miranda* rights and spoke to the officers for three hours before giving his taped statement. Shields did not ask to speak to an attorney or parent, nor was Shields threatened to induce his statement. During the hearing on the motion to suppress the statement, Shields, who represented himself, played the tape in his cross-examination of Clark. The tape recording indicates that Shields was distraught throughout the interview. Shortly after Bingham began asking questions, Shields, crying, asked, "Can we stop the tape for a minute?" Bingham stopped and later restarted the tape, stating, "Okay we're back on tape at 1200. We stopped for about 60 seconds at Remon's request. He's very upset um, he's very upset [about] what happened at the store and he is trying to compose himself so we stopped . . . ." After identifying photographs of Castille and Brown, Shields, who was still crying, asked, "[C]an we stop again?" Sergeant Bingham replied, "Let's just go on Remon, okay. I know this is hard for you." Shields stated more strongly, "Can we stop just for a second please." After stopping the tape briefly, Bingham restarted it, stating, "It's 12:07, we're back on tape. Remon is very upset and his stomach is bothering him a little bit but he has agreed he wants to finish." Clark testified that no questions were asked of Shields when the tape was stopped.

Shortly after the interview resumed, Shields began crying again. He cried as he answered Bingham's questions about the guns used and Castille's

contact with the clerk. Shields sobbed deeply as he described the shooting. Continuing to sob loudly, he expressed his remorse and told Bingham, "I can't, I can't talk no more man, it hurts man, it hurts." Bingham proceeded to ask Shields about the shotgun he used. Between bouts of sobbing, Shields replied, "I don't know . . ." "I can't . . ." "It hurts." When Bingham told Shields to take a deep breath, Shields replied, "It hurts, it hurts." Bingham told Shields, "You have to calm down so I can ask questions." Shields answered, "[All right]." Shields, however, continued to sob for the remainder of the interview. Bingham finally concluded by telling Shields, "[You're] pretty upset. I think we need to give you a break."

Shields testified that he was very emotional during the pretaped interview because the officers refused to let him contact a lawyer or speak to his grandmother. Shields claimed that Bingham told him he could not speak to his grandmother until he gave a taped statement. Shields also complained that Bingham threatened him, saying he would "throw the book" at Shields if he was not truthful.

Shields does not dispute that he waived his *Miranda* rights at the beginning of his individual interview. He argues, however, that Bingham and Clark refused to halt the interrogation when he later invoked his right to silence. Shields argues that his requests to stop the tape were an invocation of his right to remain silent, and that his statement, "I can't talk no more, man" was an additional expression of his unwillingness to talk about the case.

### b. *Castille's Statement*

Castille was interviewed by Sergeant Foster and FBI Agent Brazwell. Foster testified that Castille appeared to understand his *Miranda* rights before waiving them, and never asked to speak to his mother or an attorney. Foster stated that he never yelled at Castille during the pretaped interview. He stopped the taped interview for about one minute when Castille asked why the session was being taped. After Foster explained his reasons, taping resumed and Castille admitted his involvement in the incident.

Castille testified that he did not understand the *Miranda* advisement and stated, "I don't even know what *Miranda* rights is." He claimed that, before taping, he asked to be given a lawyer and to speak to his mother, but his requests were denied. Castille stated that during the time Foster briefly turned off the tape recorder, he asked to call his mother and speak to an attorney and also asked to take a lie detector test. Foster ignored his requests and resumed taping. Castille claimed Foster poked him in the forehead, pushed him back in his chair and yelled at him during the pretaped interview.

### c. Trial Court's Rulings

The trial court stated that it had considered the age, sophistication and experience of defendants and found their statements knowing and voluntary. It concluded that the police did not engage in coercive conduct. The court described Castille's credibility as "about as low as it could possibly get." Regarding the interruptions in the taped statements, the court concluded that neither appellant withdrew his waiver during the interruptions in taping. The court found that Shields's repeated use of the phrase "it hurts" did not constitute an invocation.

### 2. Voluntariness and Invocation of Right to Silence

On review of a claimed *Miranda* violation, we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility if substantially supported. Applying the law to those facts, we review de novo whether the statement was legally obtained. (*People v. Johnson* (1993) 6 Cal.4th 1, 25 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

The trial court found the officers were credible and the appellants not so. It rejected their claims of threats and intimidation and their assertion that they asked to speak with relatives or lawyers. Substantial evidence supports those factual findings.

Shields also argues that his requests to stop the tape constituted an invocation of his right to silence. Whether a suspect has invoked his right to silence is a factual question to be decided in light of all the circumstances. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238 [74 Cal.Rptr.2d 212, 954 P.2d 475].) The words used by a suspect must be considered in context. (*Ibid.*) As the revered Justice Holmes observed: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." (*Towne v. Eisner* (1918) 245 U.S. 418, 425 [38 S.Ct. 158, 159, 62 L.Ed. 372].)

When Shields requested that officers stop the tape, Shields was crying, struggling to speak and regain his composure. When taping resumed, Shields did not protest or otherwise ask that questioning stop. Shields's statement, "I can't talk no more, man," was made as he expressed his remorse for the clerk's death. He was sobbing deeply at this point in the interview and much of the tape is inaudible. However, the following statements are discernable: "I went home, and I went in my room and got on my knees and I prayed for forgiveness . . . . It shouldn't have happened to him,

it should have been me, he ain't did nothing to [nobody]. . . . And nobody wanted to do it but everybody wanted to go in the store but I don't know . . . . We ain't never did nothing like this before . . . . They ain't bad, they never disrespected me or [nobody] else . . . . I can't, I can't talk no more man, it hurts man, it hurts." The trial court concluded that by making these statements Shields was not invoking his right to silence. Rather, placed in context, Shields's remark "I can't talk no more" conveyed to the officers his difficulty speaking because of the pain of accepting responsibility for the victim's death. Substantial evidence supports the trial court's conclusion.

### 3. *Welfare and Institutions Code Section 627*

██ Appellants argue that their statements were inadmissible because the interrogating officers failed to comply with Welfare and Institutions Code section 627 (section 627). Section 627 requires that an officer who takes a minor into confinement "take immediate steps to notify the minor's parent . . . that such minor is in custody and the place where he is being held. [¶] (b) Immediately after being taken to a place of confinement pursuant to this article and . . . no later than one hour after he has been taken into custody, the minor shall be advised and has the right to make at least two telephone calls . . . one call completed to his parent . . . and another call completed to an attorney. . . ."

Appellants claim the police violated section 627 by failing to inform them of their rights to these telephone calls within an hour of being taken into custody. The Attorney General argues, in essence, that the officers substantially complied with the statutory requirement. Appellants were both arrested in their homes in the presence of a parent or guardian, and were later informed, during the *Miranda* admonitions, that they had the right to speak to an attorney.

We need not determine whether section 627 was violated. Assuming arguendo that officers failed to comply with the statute, appellants have not demonstrated that such failure requires exclusion of their confessions. They argue by analogy to 18 United States Code section 5033,[9] which requires that the arresting officer immediately notify a parent or guardian when a juvenile has been taken into custody.

---

[9]Title 18 United States Code section 5033 provides in part: "Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer . . . shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense."

Appellants' reliance on the federal cases interpreting the statute and authorizing the exclusion of evidence for its violation is misplaced. Congress and the federal courts may articulate requirements and create prophylactic rules for the federal system as they deem appropriate within the scope of their authority. Those rules are not binding on the states unless the United States Supreme Court declares that the rules are constitutionally compelled and extends their requirements to the states under the authority of the Fourteenth Amendment. The Supreme Court has not done so here.

Appellants argue that even if the federal authority is not binding, we should nonetheless hold that statements taken after a violation of section 627 must be excluded. Appellants' argument fails. The passage of Proposition 8, the Truth in Evidence provision of article I, section 28, subdivision (d) of the California Constitution, has precluded judicially created rules of exclusion other than those articulated by the United States Supreme Court applying the federal Constitution. (See *People v. McKay* (2002) 27 Cal.4th 601, 608 [117 Cal.Rptr.2d 236, 41 P.3d 59].) "With the passage of Proposition 8, we are not free to exclude evidence merely because it was obtained in violation of some state statute or state constitutional provision." (*Ibid.*) "[When] state officials have been derelict under state law, the high court has reminded us that the illegality of such conduct 'under the state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution. [Citation.] And state action, even though illegal under state law, can be no more and no less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature.' [Citation.]" (*Id.* at p. 609.) While other remedies may exist for a violation of section 627, exclusion of appellants' statements is not among them.

Finally, the Truth in Evidence provision authorizes the Legislature to enact statutes requiring evidentiary exclusion upon the approval of two-thirds of the membership in each house. The Legislature did not include such a provision in connection with section 627. Instead, the statute provides that its violation is punishable as a misdemeanor. We will not, and cannot, do what the Legislature could have, but did not do. Failure to comply with section 627 does not require or authorize the suppression of subsequently acquired statements.

II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 469.

## DISPOSITION

The judgment is affirmed.

Parrilli, J., and Pollak, J., concurred.

A petition for a rehearing was denied May 30, 2003, and the petition of appellant Clemeth Ray Castille for review by the Supreme Court was denied July 30, 2003. George, C. J., and Brown, J., did not participate therein.