[No. E030778. Fourth Dist., Div. Two. Oct. 2, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHELLE LYNN JENNINGS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2, 3, 4 and 5 of the Discussion.

## COUNSEL

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson and Gary W. Schons, Assistant Attorneys General, Pamela A. Ratner Sobeck and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McKINSTER, Acting P. J.**—Defendant appeals from her conviction for the first degree murder (Pen. Code, § 187)[1] of her five-year-old son under circumstances indicating severe abuse and neglect. The father of the victim was also charged with murder and the two were tried jointly. A death-qualifying torture-murder special circumstance was found to be true as to the father, but not defendant. The father is not a party to this appeal.

We affirm defendant's conviction, concluding: (1) Several hearsay statements made by the father during a joint interrogation that implicated defendant in the abuse of the victim failed to qualify as adoptive admissions and were therefore improperly admitted into evidence in violation of *Aranda* and *Bruton*. (*People v. Aranda* (1965) 63 Cal.2d 518, 530–531 [47 Cal.Rptr. 353]; *Bruton v. United States* (1968) 391 U.S. 123, 137 [20 L.Ed.2d 476, 88 S.Ct. 1620].) Furthermore, the admission of a separate statement by defendant after excising the portions where she blamed the father for some of the abuse similarly violated *Aranda* and *Bruton*. Nevertheless, we find these errors to be harmless beyond a reasonable doubt when placed in the context of the entire joint interrogation, wherein the father ultimately withdrew most of his allegations against defendant and defendant admitted to conduct generally consistent with the remainder of the father's allegations. (2) The trial court was not obligated to grant defendant a new trial on the murder charge after concluding that she lacked the necessary intent to kill to support the torture-murder special circumstance, because first degree murder by torture merely requires an intent to cause extreme pain and suffering, not an intent to kill. (3) There was sufficient evidence of intent to cause extreme pain and suffering because, in addition to the physical abuse, the victim had been severely starved in a deliberate and premeditated fashion. (4) And the jury instructions regarding the intent element of aider and abettor liability were not misleading.

---

[1] All further statutory references will be to the Penal Code unless otherwise indicated.

STATEMENT OF FACTS

### 1. *Family Background*

Defendant and the father of the victim both suffered from extreme abuse as children. The father's parents were abusive physically and sexually with all of their children, most of whom were ultimately removed from the home and placed in an orphanage. Defendant's father was physically abusive to her and her mother, and sexually abused defendant's sisters. Defendant's father began sexually molesting defendant when she turned 12 years old. Defendant became pregnant by her father and had an abortion at age 13. Defendant subsequently ran away and moved in with the father of the victim, who was 15 years older than she.

Defendant became pregnant and gave birth to the victim when she was 14 years old, at a time when she and the father were living in the father's truck and constantly on the road. The victim was born prematurely and was underweight, pale, and sickly. The paternal grandmother initially took the victim away from them because she thought defendant was too immature to raise a child. But when the paternal grandmother became ill, defendant and the father asked a paternal aunt to take the victim until they could find a job and a suitable home. The aunt testified that the victim was difficult if he did not get his way and would occasionally run away to a neighbor's home.

In March 1995, when the victim was around five years old, defendant gave birth to a baby girl. That November, the father called the aunt and said they were ready to take the victim back. The victim was in good health at the time and weighed about 64 pounds, but suffered from seizures that defendant and the father described as the victim clenching his fists, holding them to his chest, shutting his eyes, and remaining rigid.

The aunt said that defendant's home was a "dump" on the outside, consisting of two trailers, a shed, and other junk, but was clean and neat inside. The home was in an unincorporated area in the desert just off a dirt road. The aunt stayed for awhile and the victim seemed happy in his new home. Before leaving, the aunt told defendant and the father that she would take the victim back if he proved to be too difficult for them.

### 2. *Family Life*

Several neighbors and friends testified about the victim's family life. One neighbor met the victim when he first came to live with defendant and thought that he appeared healthy. The neighbor went over to defendant's house for Christmas dinner that year and the victim was given two helpings

of food. The neighbor noticed that the victim's hand was bandaged and was told that the victim had touched the stove.

The neighbor returned a couple of weeks later, saw that the victim had a large bruise on the side of his face, and was told that the victim fell down. The neighbor continued to see the family about once a week until the victim disappeared. The last time the neighbor saw the victim, he looked unhappy, remained quiet, and kept his head down.

The neighbor testified that defendant seemed to be the "man of the house" and claimed that the father referred to her as the "boss." The neighbor indicated that when he accidentally damaged defendant's car while helping the father work on it, the father did not seem to care, but defendant became angry and confronted him. Another neighbor indicated that the father actually controlled defendant.

A friend of the family saw the victim when he first arrived and also thought he looked fine. The friend returned a couple of weeks before Christmas to introduce his brother to the family and noticed the victim sitting cross-legged in his bedroom, rocking back and forth, with two black eyes, making a "weird" noise. The father explained that the victim kicked defendant and she retaliated by knocking him out. The friend's brother claimed that defendant confirmed that story by saying, "I socked the damn little brat between the eyes."

In early January 1996, an employee at a local service station saw the victim "pretty beat up." He had black eyes, a burned hand that had been bandaged, and one eye that was closed, red, and seeping. He looked very thin and undernourished. Another employee similarly saw the victim with bandaged head and hands, very thin, with dried blood on his face, and red eyes. She saw the paternal grandfather give the victim some milk, which he drank quickly.

Also in January, defendant contacted child protective services to report that a neighbor had a baby in poor living conditions. During the conversation, defendant mentioned that she could not manage the victim and asked whether there was an adoptive home available for him. The social worker discussed some options, including returning the victim to the aunt, getting therapy, or taking parenting classes, and gave defendant a telephone number for an adoption worker. At one point, defendant and the father came into the office to provide information about the neighbor. They brought their baby girl with them, but not the victim. The baby girl appeared clean, healthy, and happy, and they all seemed bonded and were interacting positively. An adoption worker subsequently received a telephone call from an unidentified woman

who had the same problem as defendant and suggested that the woman return the child to the aunt who had been taking care of him, but to call back if that did not work.

In early February, a female neighbor went over to the family's home to borrow some cigarettes. She testified that the father and the victim were watching a movie, and she joined them. The father eventually made the victim go back to his bedroom, then tried to kiss the neighbor. When the victim came back out and saw them kissing, the father hit him in the head with a fireplace shovel, threw him on his bed, and left him there crying. The father told the female neighbor that she would see the bottom of a mine shaft if she said anything about the incident. The neighbor left, pledging to keep quiet. The neighbor also testified that she once saw the father make the victim hold a board above his head and then hit the victim when he dropped it.

3. *Victim Disappears*

A couple days after the shovel incident, defendant and the father came into the sheriff's office to report that the victim was missing. Defendant and the father reported that they saw the victim the night before and discovered him missing in the morning. They said the victim was not happy with them and wanted to return to his aunt. They seemed unconcerned with the situation, passing it off as another run away incident. A detective went to their home, took brief statements from them, and searched the area, but found nothing. The detective described their trailer as crowded, unkempt, and not very clean.

When defendant and the father were separated and further questioned, the father admitted that the victim was not really missing and claimed that he actually died from a fall. The father led a detective to a mine shaft where the body had been dumped.

Around the same time, defendant separately admitted to a polygraph technician that the victim was dead and led a detective to the same mineshaft. Defendant claimed she was familiar with the area because she had been there "on more than one occasion looking for a place." Defendant said that the victim had been dead for a couple of days, and they initially buried the victim near a chicken coop before moving the body to the mine shaft.

Defendant told a detective that on the weekend the victim died, she gave him seven or eight pills consisting of a mixture of sleeping pills, Valium, and Vicodin, in order to relax his muscles and let him sleep. On the morning the victim died, she gave him two sleeping pills, then went out to the desert with the paternal grandfather. Defendant said that she broke down and cried when she learned that the victim had died and wanted to report it to the police

immediately. Defendant admitted to the polygraph technician that she had slapped the victim before and that the victim was so badly bruised that she had to put make-up on him.

### 4. *Joint Interrogation*

After obtaining separate statements from defendant and the father, the detectives decided to interrogate them together. At the start of the joint interrogation, the detectives obtained *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*)) waivers from defendant and the father, and indicated that they wanted to explore some inconsistencies between defendant's separate statement and the father's separate statement.

The detectives started with the physical abuse, asking the father about his separate statement that defendant began "beating on" the victim within a couple of weeks and was more abusive than the father, who merely disciplined the victim with spankings and time-outs. Defendant interjected that the father was lying and denied that she ever hurt the victim, claiming that all she did was spank him. The father responded that they were probably both "overzealous" when it came to punishments.

Defendant subsequently admitted that she disciplined the victim by spanking him, sending him to the corner, and smacking him to bring him out of his seizures, but claimed that the father had recently gotten carried away and began hitting the victim with his fist. The father conceded that he was probably abusive, but could not remember punching the victim.

Defendant also accused the father of dragging the victim home, throwing him onto the porch, and bruising his forehead. The father conceded that he once dragged the victim home, but claimed that the victim hit his head when he tripped over a step on the porch.

Defendant further accused the father of knocking the victim down with an elbow, kicking him in the midsection, making him hold a wooden beam over his head and knocking him down when he dropped the beam, and holding his hand over the stove and burning it. At first, the father reluctantly admitted to some of these abuses, conceding that "most" of the injuries on the victim were from him. But when defendant begged him not to do this to her, he admitted to all of the abuse. Nevertheless, the father continued to assert that defendant was also abusive, just not "overly" so, and that some of the things she did may have contributed in a "very minor way" to the victim's death.

The father also admitted that during one of the victim's seizures a couple days before dying, the father shook the victim hard enough that the victim's

head hit the wall. When defendant tried to stop the father, he pushed her away. The father only caught his senses and stopped when defendant began screaming that he was going to kill the victim.

The father further admitted that he put a sock in the victim's mouth and used duct tape to silence the victim, and may have used duct tape to bind the victim's hands. The father claimed he did this to keep the victim from biting his tongue or gouging himself with his fingers during his seizures.

The detectives next confronted the father about his prior statement that he and defendant had talked about "killing" or "get[ting] rid of" the victim. Defendant interrupted, saying that she never wanted to kill the victim and that she told the father that they could not do that. Defendant claimed that she proposed sending the victim back to his aunt or leaving him with his paternal grandfather. The detectives then asked the father how he planned to kill the victim and he responded that he did not know. Defendant again interjected, volunteering that the father talked about shooting the victim, but she told him no, that they should just send him to his aunt or grandfather. The father admitted that was true.

The detectives also asked about the father's prior statement that two days before the victim died, he and defendant had gone out to look for a place to dump the body. Defendant admitted that they went out driving around in the desert, but claimed that she did not know that they were looking for a place to dump a body. The father agreed, saying that he was only looking for a place to dump the body "in the back of my mind." The father indicated that the paternal grandfather told him about the mineshaft during a discussion with some neighbors, and defendant claimed that the father had the paternal grandfather take her to the mineshaft on the day the victim died because she had never seen one before. Defendant indicated that before she left to look at the mineshaft, she gave the victim CPR to get him breathing properly.

The detectives next addressed the issue of the cover-up, asking the father about his prior statements that defendant dug the original hole for the body and then put the body in the mineshaft after they moved it. Defendant turned to the father, asking him why he was doing this to her and begging him to tell the detectives who actually did all of that. The father eventually admitted that he did all of it, claiming that he moved the body to the mineshaft because he was afraid someone would find it and that he planned to throw old tires on top of the body to hide it. Defendant and the father also admitted to cleaning up the victim's bedroom after disposing of the body. The father said there was blood on the walls and admitted that it may have come from when he shook the victim. The father burned the sheets and gloves in the stove, and hid the victim's clothes and glasses in a trash dumpster, saying that he knew what he did was wrong.

Defendant claimed that she wanted to report the death, but the father would not let her because they would go to jail for child abuse. Defendant indicated that she went along with the father out of fear because the father once told her that he would kill her if she put him in jail. The father admitted that he told her that, but claimed that was a long time ago. Defendant also indicated that the father threatened to hurt her and the baby if she told anyone. The father denied that allegation, claiming that he only told her that it would hurt them all if they got caught, because then they would be separated. After more pleading from defendant, the father eventually admitted that he physically threatened her to get her to go along with him and she only did what he told her to do.

At one point, the father volunteered that they gave the victim prescription drugs, such as Vicodin, in order to get the victim better so they could give him away. The detectives then asked about the father's prior statement that defendant was giving the medication, the father tried to stop her by hiding the medication, but she found it and continued. The father admitted that was not true, that they both gave the victim medication and he told defendant to do so because he thought it would help the victim. For her part, defendant admitted that she previously lied about how many pills she gave the victim in order to protect the father. Defendant claimed that she actually only gave the victim one Valium and the sleeping pills, and the father administered the other pills.

The detectives also confronted the father about his prior assertion that defendant hit the victim with a shovel the day he died. Defendant again objected, asking the father if that was true. The father admitted that was a lie, that nobody hit the victim with a shovel, that the victim actually hit his head on a kitchen table. But the detectives persisted and the father changed his story, claiming that he was holding the shovel when he sat the victim down against a wall and the victim landed against the shovel. The detectives also refused to believe that story and the father eventually admitted that he could not actually remember how the victim hit his head.

At that point, defendant asked to leave the room and was escorted out. In her absence, the father admitted that he used defendant's love against her, along with some fear and intimidation. When defendant returned, the detectives left them alone for a few minutes but continued to record their conversation. They talked about the father's likely punishment and about how much they loved each other, and defendant convinced the father to sign a full confession so that she could stay out of jail and continue to care for their baby girl.

When the detectives returned, they immediately asked who killed the victim. Both defendant and the father initially denied killing the victim, but

father eventually admitted that the victim probably died from all the things he did, even though he did not intend to kill the victim.

The detectives then returned to the shovel incident. The father admitted that the female neighbor had been in the house while defendant was gone and claimed that she hit the victim with the shovel. Sensing that the father was reluctant to talk about the female neighbor in defendant's presence, one of the detectives took defendant outside. In defendant's absence, the father admitted that the victim caught him kissing the female neighbor. The father claimed that the neighbor became mad and hit the victim with the shovel in order to keep the victim from telling her husband. The father claimed that he kicked the neighbor out of the trailer and tried to help the victim by cleaning the wound and giving him some drugs, but the victim died within an hour.

Under further questioning, however, the father's story changed again, and he finally confessed that he hit the victim with the shovel after the victim caught him kissing the neighbor. The father admitted that he knew he had to finish the victim off when the victim caught him with the neighbor. The father further admitted that he caused all the bruises, that defendant never beat the victim, that he was abusive toward defendant and coerced her into going along with him, and that defendant did not have "much" involvement.

After the father's confession, defendant was brought back into the room and the father told her what he had done. Defendant appeared shocked and wanted to know why the father did it. The detectives again left the two alone together and recorded their conversation. In the absence of the detectives, defendant again asked the father why he did what he did and pleaded with him to sign a confession so that she could continue to care for their baby girl. The two pledged their love for each other and the father asked defendant to take care of their baby girl. The joint interrogation ended at that point.

## 5. *Physical Evidence*

The police found evidence of blood spatters all around the victim's bedroom. The spatters were consistent with a hand striking flesh that was already bleeding. Although the spatters indicated multiple strikes, it was unknown whether they all occurred at the same time. The police also found a bloodstained sock stuffed into a hole in the wall behind the victim's bed.

An autopsy revealed that the victim was extremely thin, weighing only 35 pounds. The body had no fat layer and the muscles appeared to be wasting, giving the limbs a spindly appearance. There was no food in the stomach. The victim had bruising, abrasions, and a laceration on the nose, lips, and gums, and bruises and abrasions on the torso and arms. There were old scars

on the right hand from a severe burn and some scarring on the right thigh. There was a fresh head wound and an old scar on the head. There was also an old subdural hemorrhage and hemorrhaging around the optic nerves, which is commonly caused by violent shaking and may result in brain damage. The victim also had recently contracted pneumonia. There was enough Unisom in the victim's blood to kill him, along with some Vicodin and Valium in quantities too small to be toxic.

The main cause of death was listed as drug toxicity, with contributing causes of acute and chronic abuse and neglect based on the child's injuries and severely emaciated, malnourished state. The malnutrition lowered the child's immune system and may have contributed to the pneumonia. The coroner opined that even without the drugs, the child probably would have died within a short period of time due to the malnutrition and pneumonia, unless treated and fed.

### 6. Trial

Defendant and the father were tried jointly on charges of first degree murder (§ 187) with death-qualifying special circumstances of murder by torture and murder by poison (§ 190.2, subds. (a)(18) & (a)(19)). The jury was presented with all the evidence noted above, including a videotape of the joint interrogation, which was played for the jury.

During the defense case, defendant's psychologist testified that defendant admitted slapping the victim in order to bring him out of his seizures. Defendant thought the seizures were intentional, like temper tantrums, because that was what the father told her. Defendant told the psychologist that the father made her withhold food from the victim as a form of discipline because hitting the victim was not working. Defendant did this for the most part, but occasionally slipped the victim food.

On rebuttal, the prosecution presented the polygraph technician who was present for defendant's original separate statement. The technician testified that defendant said she had an excellent relationship with the father, they got along fine, and he treated her well. Also, during the car ride back from the mineshaft where the body was hidden, defendant indicated that the father beat her when they were first together, but stopped early on when she threatened to leave. Defendant told the technician that the father did not threaten her, but she had to go along with him if she wanted a life with her "husband" and baby.

The jury found both defendant and the father guilty of first degree murder. In regard to the special circumstances, the jury found the murder by poison circumstance to be untrue as to both defendants, but found the torture-murder

special circumstance to be true as to the father. The jury was unable to reach a verdict on the torture-murder circumstance for defendant, so the court declared a mistrial as to that allegation.

The torture-murder special circumstance for defendant was retried to the court on the transcript from the first trial. Defendant recalled her psychologist, who testified largely the same as before. The trial court ultimately found the torture-murder special circumstance to be not true, concluding that defendant did not have the requisite intent to kill.

DISCUSSION

### 1. *Severance*

Defendant argues that her trial should have been severed from the father's trial primarily because of an alleged *Aranda/Bruton* violation arising from the use of the father's statements implicating her during the joint interrogation. (*People v. Aranda, supra,* 63 Cal.2d 518, 530–531 [47 Cal.Rptr. 353, 407 P.2d 265]; *Bruton v. United States, supra,* 391 U.S. 123, 137 [20 L.Ed.2d 476, 88 S.Ct. 1620].) ▆ *Aranda* and *Bruton* stand for the proposition "that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120–1121 [240 Cal.Rptr. 585, 742 P.2d 1306].) *Aranda* and *Bruton* found that a limiting instruction was insufficient to cure the confrontation clause problem because accusations from a codefendant are so inherently prejudicial that a jury cannot be trusted to ignore them when considering the guilt of the defendant, even when specifically instructed to do so. (*Ibid.*)

In our case, the police tried to avoid the *Aranda/Bruton* issue altogether by interrogating defendant and the father jointly. The First District, Division Three recently approved of this technique in *People v. Castille* (2003) 108 Cal.App.4th 469 [133 Cal.Rptr.2d 489], where the police jointly interrogated three codefendants in a robbery/homicide. During the joint interrogation, officers "asked the defendants to recount some aspect of the crime. Once a statement, or series of statements was made by one of them, the officer would turn to the other defendants and ask each of them in turn whether what the original speaker had said was true. In the vast majority of instances, each of the others confirmed that the original statements were accurate." (*Id.* at p. 476.) At the end of the joint interrogation, officers asked each defendant whether they understood and agreed with everything that had been discussed, and elicited affirmative responses from each defendant. (*Id.* at p. 477.) *Castille* concluded that the entire joint interrogation was admissible in a joint

trial because any hearsay was subject to the adoptive admissions rule, a "firmly rooted" hearsay exception that avoids any *Aranda/Bruton* confrontation clause issues. (*Id.* at pp. 478–479; Evid. Code, § 1221; see also *People v. Osuna* (1969) 70 Cal.2d 759, 765 [76 Cal.Rptr. 462, 452 P.2d 678] [finding no *Aranda/Bruton* error when conversation among codefendants in noncustodial setting was admitted under the adoptive admissions rule].)

■ We agree with the basic premise of *Castille* that adoptive admissions are a firmly rooted hearsay exception that do not offend the confrontation clause and adopt its reasoning in that regard. Nevertheless, we conclude that *Castille* should be limited to its facts: a joint custodial interrogation involving unequivocal, express adoptive admissions. There is no valid reason to extend *Castille* to implied adoptive admissions arising from equivocal conduct, such as defendant's silence in this case.

■ Silence can normally be interpreted as an adoptive admission, but not when the circumstances " 'lend themselves to an inference that [the defendant] was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969].) And silence during a post-*Miranda* custodial interrogation is generally interpreted to be an assertion of that right and therefore constitutionally inadmissible. (*People v. Medina* (1990) 51 Cal.3d 870, 891 [274 Cal.Rptr. 849, 799 P.2d 1282].) As the United States Supreme Court has concluded, the *Miranda* warnings render every postarrest silence "insolubly ambiguous" and therefore constitutionally inadmissible, even for the limited purpose of impeachment. (*Doyle v. Ohio* (1976) 426 U.S. 610, 617–619 [49 L.Ed.2d 91, 96 S.Ct. 2240], italics added.)

The California Supreme Court previously addressed this very issue in *People v. Cockrell* (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116], where the defendant was arrested and confronted by a witness who claimed to have purchased marijuana from him. When a police officer subsequently asked the defendant "what he had to say about 'that,' " the defendant remained silent. (*Id.* at p. 669.) Justice Traynor, speaking for a unanimous court, concluded that the defendant's silence was constitutionally protected regardless of the adoptive admissions rule because, "even though it does not appear that [the defendant] made any statement indicating that he was invoking his privilege against self-incrimination, he had a right to remain silent and an inference adverse to him may not be drawn from his silence."

(*Id.* at p. 670.) Thus, silence during a joint custodial interrogation remains constitutionally protected and cannot be used to prove an adoptive admission.[2]

The conclusion that equivocal conduct, such as silence, is constitutionally protected is further supported by an analogous case from the Minnesota Supreme Court. In *Village of New Hope v. Duplessie* (1975) 304 Minn. 417 [231 N.W.2d 548, 550], the defendant's juvenile accomplice made statements during a joint custodial interrogation that incriminated the defendant, to which the defendant replied by nodding his head and laughing. (*Id.*, 231 N.W.2d at p. 550.) The *Duplessie* court concluded that a defendant's constitutional rights to remain silent and confront his accuser were threatened by the use of equivocal conduct during a joint custodial interrogation to prove an adoptive admission. (*Id.* at p. 552–553.) As a result, the *Duplessie* court held that before such evidence can be admitted, "the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements which are *unequivocal, positive, and definite* in nature, *clearly showing* that in fact defendant intended to adopt the hearsay statements as his own." (*Id.* at p. 553, italics in original.) The court ultimately concluded that the defendant's ambiguous head nod and laugh failed to satisfy this standard. (*Ibid.*) Surely, unadorned silence fails to satisfy that standard as well.

At oral argument, the Attorney General argued that because defendant expressly waived her *Miranda* rights at the beginning of the joint interrogation, her silence as to some of father's accusations could be used against her as implied adoptive admissions. Not only is such a rule contrary to the authorities cited above, but it would also be a drastic departure from *Miranda, supra,* 384 U.S. 436, where the United States Supreme Court indicated that its aim was to "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process," and warned that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he *stood mute* or claimed his privilege in the face of accusation." (*Id.* at pp. 468, fn. 37, 469, italics added.) We therefore reject the Attorney General's argument that defendant's silence, after she initially waived her *Miranda*

---

[2] Cases that have allowed silence to be used as an adoptive admission are distinguishable in that they did not involve custodial interrogation. (See, e.g., *People v. Medina, supra,* 51 Cal.3d at pp. 890–891; *People v. Osuna, supra,* 70 Cal.2d at p. 765.) And even outside the context of custodial interrogations, silence remains constitutionally protected if it appears to be an assertion of the right to remain silent. In *People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1518–1519 [275 Cal.Rptr. 810], after being released on bail, the defendant refused to respond to his girlfriend's questions, claiming that his attorney had advised him to remain silent. The *Eshelman* court concluded that the defendant's silence in that context was inadmissible because it was an assertion of his right to remain silent. (*Id.* at pp. 1520–1521.)

rights, could be used against her unless she expressly reinvoked her right to remain silent in response to father's accusations.

Lastly, we note that the California procedure of permitting the jury to decide whether equivocal conduct, such as silence, constitutes an adoptive admission (see *Castille, supra,* 108 Cal.App.4th at p. 482; CALJIC No. 2.71.5) only exacerbates the *Aranda/Bruton* problem presented by this case. As noted above, *Aranda* and *Bruton* were based on the conclusion that statements by codefendants are so inherently persuasive that a jury cannot be trusted to ignore them, even when specifically instructed to do so: The proverbial bell that cannot be unrung. Allowing a jury to decide whether silence constitutes an adoptive admission presumes that the bell can be unrung in direct contravention of *Aranda* and *Bruton.* Worse yet, the jury is instructed that the bell need not be unrung so long as the jury decides that the silence was an adoptive admission. A jury that is incapable of ignoring codefendant statements when specifically instructed to do so, is certainly incapable of properly applying the adoptive admissions rule to such statements. The inherent persuasiveness of such statements make it far too tempting to find an adoptive admission even where there is none. And even if the jury determines that there was no adoptive admission, it is again asked to disregard the underlying statements, bringing us full circle back to trying to unring the bell that *Aranda* and *Bruton* say cannot be unrung.

Having established that silence during a joint custodial interrogation is not admissible to prove an adoptive admission, we are left to apply that rule to our case. ■ On several occasions, defendant sat silent in the face of potentially damaging statements from the father, such as: (1) they were both "overzealous" in disciplining the victim; (2) defendant did not kill the victim, but is involved "just like I am"; (3) defendant was abusive, but not "overly" so; (4) defendant's conduct may have contributed to the victim's death, "but very minor"; and (5) defendant's involvement in the death was "not that much," implying that defendant was somehow involved.[3] These statements and defendant's silence were not adoptive admissions and should have been excluded from evidence.

The application of *Castille* to our case is further constrained by the long-standing rule that denials are not admissions and must be excluded from evidence along with the underlying accusations. (*People v. Lapara* (1919)

---

[3] On two of these occasions defendant was not even given a chance to respond because she was out of the room or the detectives quickly changed the subject. Even if we were to apply the adoptive admissions rule, these statements would be inadmissible because the adoptive admission rule requires at a minimum that the accusations be made " 'under circumstances which fairly afford . . . an opportunity to hear, understand, and to reply.' " (*People v. Riel, supra,* 22 Cal.4th at p. 1189.)

181 Cal. 66, 71–72 [183 P. 545]; 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 140, p. 850.) During the joint interrogation, defendant expressly denied many of the father's more damaging allegations, such as: (1) defendant began "beating" the victim within two weeks and was more abusive than the father; (2) defendant dug the hole where the body was first buried and then moved the body to the mine; and (3) defendant was giving the victim Vicodin and Valium; the father tried to stop her by hiding the pills, but defendant found the pills and continued administering them. These statements and denials should also have been excluded from evidence.

Defendant also argues that the prosecution's belated decision to use portions of her separate statements to the polygraph technician and a detective violated *Aranda/Bruton*. During trial, the prosecutor asked the polygraph examiner: "[D]id [defendant] tell you any actions she had taken in reference to bruising on the child?" The polygraph technician responded: "The child's face and chest were bruised so badly that she had to apply makeup to her son's face in order to allow him to go out to play." The father's counsel then asked on cross-examination: "Did [defendant] indicate to you how the bruising on the child's face and chest occurred?" The technician responded: "She told me that she had hit him on his face and chest area causing the bruising that she referred to." Although defendant also alleged that the father hit the victim "several times with his fists causing some bruising," that portion of defendant's statement was excluded as a result of the father's *Aranda/Bruton* objection, leaving the jury with the inaccurate impression that defendant separately confessed to causing all of the victim's bruises. A similar error occurred in regard to defendant's separate statement to a detective about giving the victim seven or eight pills on the weekend he died. Although defendant claimed that she only gave the medications because the father told her to, that portion of her separate statement was also excluded due to the father's *Aranda/Bruton* objections, leaving the jury with the inaccurate impression that defendant admitted to giving the victim the medication on her own initiative.

This portion of defendant's *Aranda/Bruton* argument also has merit. *Aranda* noted that "[w]hen the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted *without prejudice to the declarant* . . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) *If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible.*" (*Aranda, supra,* 63 Cal.2d at pp. 530–531, italics added.)

■ Our case falls within the third option. Defendant's separate statement should therefore have been excluded if the necessary deletions would prejudice her. And the deletion was prejudicial insofar as it made it appear that defendant separately admitted to more than she did during the joint interrogation.

Despite these apparent *Aranda/Bruton* errors, we see no basis for a reversal. When considered in context, we find these errors to be harmless beyond a reasonable doubt. (*Anderson, supra,* 43 Cal.3d at p. 1128.) The father ultimately conceded that most of the improperly admitted accusations were lies. Furthermore, the allegations that the father failed to retract were generally consistent with defendant's express admissions and often benefited her by minimizing her conduct. Even the misuse of defendant's separate statement was ultimately harmless when compared to the joint interrogation, wherein the father admitted to inflicting the lion's share of the abuse and to instructing defendant to give the medications.[4]

2.–5.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.[6]

Gaut, J., and King, J., concurred.

On October 15, 2003, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 14, 2004.

---

[4] Defendant further argues in her reply brief that severance was warranted by factors other than the *Aranda/Bruton* violation, such as conflicting defenses, a prejudicial association with the father, and the great disparity in culpability between the defendants. Defendant having raised this argument for the first time in a reply brief, we need not address it. (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Even if we were to address it, we see no reason to disturb the trial court's exercise of discretion. (*People v. Pinholster* (1992) 1 Cal.4th 865, 932 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

[6] Defendant also raises a voluntariness challenge to her separate statements to the polygraph technician and a detective. Although defendant concedes that this issue was not litigated below, she requests that we nevertheless remand for a hearing in order to avoid a separate habeas petition. We decline the invitation.