[No. A089623. First Dist., Div. Three. May 24, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CLEMETH RAY CASTILLE et al., Defendants and Appellants.

COUNSEL

Robert Joseph Beles and Paul McCarthy for Defendant and Appellant Clemeth Ray Castille.

Stephen Michael Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant Remon Shields.

Bill Lockyer, Attorney General, Catherine A. Rivlin and Christina Vom Saal, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, Acting P. J.**—Three defendants were tried together for murder with special circumstances and attendant enhancements. They had been questioned during a joint interview, a tape recording of which was admitted at trial. In our original opinion, we held that the statements were properly admitted against each defendant. (*People v. Castille* (2003) 108 Cal.App.4th 469 [133 Cal.Rptr.2d 489]) (*Castille I*). The United States Supreme Court granted certiorari and remanded the case for further consideration in light of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Remon Shields and Clemeth Ray Castille, both 17 years old, and Robert Brown, age 18, decided to rob Sharif's Market in Oakland. Shields collected two sawed-off shotguns: a single-shot 16-gauge Winchester and a pump-action, 12-gauge Mossberg. After Shields put the guns in Brown's car, Brown drove all three to the store.

At Shields's direction, Brown made a U-turn in front of the market and parked about 15 feet from the door. Shields and Castille got out of the car, put on ski masks and covered their heads. Before entering the store, Shields handed Castille the 16-gauge shotgun that fired lead pellets. Shields carried the 12-gauge Mossberg that fired a slug. Brown remained in the car. Inside the market, Abdo Nashar stood behind the counter near the cash register. Nabil Abdullah was checking a display at the front counter and owner Ibrahim Sharif El-Din was in an upstairs apartment.

Appellants had agreed that Shields would approach the clerk and Castille would act as "back-up." However, Castille walked in first and approached Nashar at the register. Shields followed and stood at the door, about six to

eight feet from the counter. Abdullah heard Castille say something to Nashar, after which Nashar grabbed the gun and struggled with Castille. Frightened, Abdullah began to back away, telling Nashar to give Castille the money. Abdullah saw Shields pointing his shotgun into the interior of the store. As he hid behind a refrigerator, Abdullah heard two shots, six or seven seconds apart. He looked out to see Nashar lying behind the cash register, bleeding. Nashar died from a gunshot wound to the head.

In the apartment above, Sharif El-Din looked out the window and saw a car parked near the store with the passenger-side door open. He heard someone inside the car ask, "Did you kill him?" He also heard another voice yell, "Go! Go! Go!"

The shotguns were kept at Castille's house for several weeks until Brown and Castille gave them to a friend to sell. The friend alerted police and the guns were recovered. A firearms expert opined that wadding found on the floor of the market and an expended shell casing found outside the store came from the 12-gauge Mossberg that Shields had carried into the business. Once loaded, the Mossberg had to be pumped to chamber a cartridge. The pump had to be employed again to eject the shell. Approximately five pounds of pressure were required to pull the Mossberg's trigger. A large-caliber ex-pended slug was recovered from the wall five feet behind the cash register. It appeared to have passed through a plexiglas display. The holes in the plexiglas and wall were aligned. The hole in the wall was located four feet 10 inches from the floor. The victim was five feet three inches tall. The path of the wound was from the victim's left to right at a 30-degree downward angle. The wound was consistent with having been caused by a slug, rather than shotgun pellets. Shotgun pellets were found next to and inside the cash register.

Shields, Castille and Brown were eventually arrested and interviewed separately. Each waived his Fifth Amendment rights after a proper *Miranda*[1] admonition. When the individual statements were completed, the suspects were brought together and a joint interview was conducted. Defendants did not testify and their individual statements were not offered.

The jury convicted Shields and Castille of first degree murder with the special circumstance that the murder occurred during the attempted commis-sion of a robbery. The jury also found that Shields and Castille each used a firearm during the crime. Brown was convicted as an accessory armed with a firearm. Shields and Castille were sentenced to life in prison without parole plus 10 years for the firearm enhancements. Brown, who was sentenced to

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

four years in prison, does not appeal. We use the collective term "defendants" to refer to Shields, Castille and Brown. The term "appellants" refers to Shields and Castille.

## DISCUSSION

### I. *Admissibility of the Joint Interview Statement*

Before trial, the prosecutor indicated he would offer the joint statement during his case-in-chief. Defendants objected and, in the alternative, sought separate trials. As we explain more fully below, appellants' significant admissions regarding the attempted robbery and murder do not offend the principles enunciated in *Crawford, Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*), and *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*). Those portions of the joint interview were properly received in evidence. Some of the trial court's rulings regarding other portions of the interview were erroneous, but harmless.

### A. *The Joint Interview Background*

The interview was conducted under the direction of Lieutenant Ralph Lacer. Aware of the general rule under *Bruton* and *Aranda* that the statement of one defendant is inadmissible against another when they are tried together before the same jury, Lacer decided to employ a joint interview technique. Within two hours of the individual interviews, Lacer met together with four homicide detectives and all three suspects. Each defendant confirmed he had been given a *Miranda* admonition, had agreed to give a statement and was currently aware of his Fifth Amendment protections. The defendants were then questioned together.

Several methods were used to include all three defendants in the interview. The officers frequently began their inquiry on a particular topic by addressing one defendant and then continuing the account with another. Often the same question was asked of each defendant. At certain times, once a statement or series of statements was made by one defendant, an officer would turn to the other defendants and ask each of them in turn whether what the original speaker said was true. Sometimes, one of the defendants would reply that he did not remember a particular detail. When the information related solely or principally to a given defendant, questions were asked only of that defendant. On separate occasions, when Lacer was relating his understanding of what had taken place, Shields and Castille each corrected or augmented Lacer's statement.

While a number of related topics were discussed, we focus on the following events: defendants' conduct before the robbery and murder, appellants' actions inside the market, the flight afterwards, and the disposition of the guns. During the course of the interview, defendants made a combination of direct and adoptive admissions, as evident in the portions of the joint statement identified below.

Lacer began the interview with questions about planning. He asked Brown, "[W]here were you guys when you were talking about robbing the store?" Brown responded, "At [Castille's][2] house." Brown said, "I remember that, we were talking about . . . how we didn't have any money, and how, and I just lost my job. And we're just talking about . . . we need to get some money. That's about it." Lacer then asked Shields, "[H]ow do you remember the conversation at . . . Castille's house?" Shields answered, "[W]e was just talking. The stuff about money problems and stuff, I was, I said I don't know what it but popped up, but I don't know who brought it up." Lacer asked Castille, "Let me ask Mr. Castille, what do you remember of the conversation, son?" Castille answered, "We was just talking and everything, about, you know what I am saying, I have no money or whatever . . . you know, . . . just talking about it, and it just came up." When Lacer asked how the money was to be divided, Shields said he planned to give his share to Castille and Brown, but never claimed to have so informed them. Shields stated, "[I]t wasn't no talk about the money though, you know, really, cause I knew deep down in my heart at some point we was going to turn back, I knew, I knew we would, I knew."

Lacer asked Brown how the guns got in his car. Brown said that Shields put them there. Lacer then asked Shields, "Now . . . Brown said you put the guns in the car[,] is that right Mr. Shields?" Shields answered, "Yes." Castille was later asked how the guns got into the car and replied, "[Shields] brought 'em in the car." A short time later Shields was again asked, "Mr. Shields[,] you put the guns in the car is that correct?" Shields answered, "Yes." Lacer misunderstood Shields to mean that he took the guns to Castille's home before placing them in the car. Castille raised his hand to correct Lacer and said the guns were not taken into his house. Shields acknowledged that he took the guns directly to the car, which was parked in front of Castille's house. When Lacer asked where he got the guns, Shields said they were in his basement. Shields also said he loaded both guns. Castille said that Shields had the guns wrapped up. One of the other officers then asked Shields, "Mr. Shields, . . . what were they wrapped in?" Shields said the shirts were wrapped in a black T-shirt. Brown could not recall this fact.

---

[2] Throughout the interview, both officers and defendants used family names on some occasions and first names on others. In the interest of clarity, we substitute surnames when a first name was used.

Brown explained that he drove to Sharif's Market. Castille sat in the front seat; Shields was in the back. Sergeant Madarang asked, "Okay now, [Shields], you were in the backseat, is that correct?" and Shields answered, "Yes." Madarang said, "Okay and [Castille], you remember you were in the front seat correct?" and Castille answered, "Yes." Brown said he thought Shields told him to make a U-turn in front of the store. Shields was then asked if Brown turned around when Shields told him to do so and Shields said, "Yeah." Then Castille was asked: "[I]s that what you remember. That you made .a [U]-turn in front of the store after uh [Shields] said, turn around?" Castille replied, "Yes." Madarang asked Brown how far from the market he parked and Brown stated, "Like 15 feet." Madarang asked Shields, "Okay[,] do you remember being about 15 feet away in the car, approximately?" Shields said, "I don't know, about . . . approximately."

Madarang asked Castille what he did after the car was parked. Castille explained that he got out of the front seat of the car and pulled his jacket hood over his head. Madarang asked Shields, "Okay now did you put on your hood uh [Shields], at the same time when you got out of the backseat?" and Shields answered, "Yeah." Brown confirmed that both Castille and Shields covered their heads. Later, Madarang said, "I know that you had some ski masks okay." Castille said his mask was purple or blue, and Shields described his own mask as gray. Each man described his mask as having one large hole to see through, rather than two separate eyeholes.

Madarang asked Shields, "[W]as this the time in which you gave uh [Castille] his gun?" Shields answered, "Yes." The officer then asked, "[Castille], you took the gun from [Shields] at that point?" Castille answered, "Yes," and the officer turned to Brown and asked, "Okay now [Brown], what did you do? Did you stay in the car?" Brown replied affirmatively. Lacer asked Shields to describe the gun he gave to Castille. When Shields stated that it was a 16-gauge, Lacer asked Castille, "And, Mr. Castille, is that correct, is that the kind of gun you got?" Castille replied, "Yes."

Lacer asked Shields, "[W]hy did you carry that gun in the store?" Shields answered, "To go up in there to rob." Castille was then asked, "[W]hy did you carry a gun in the store?" Castille answered, "Watch my partner[']s back, really. Go up in there, we had intentions to rob the place and stuff." Lacer then asked Castille, "Was Mr. Shields gonna be the main robber, and you were going to be the back-up robber . . . ? Or are you both, both the main robbers?" Castille answered that his own role was back-up. Lacer then asked Shields, "[W]ere you going to go in and demand the money and was Mr. Castille just going to stand back and cover your back like [he] said?" Shields answered, "I guess." Lacer then said, "I don't know[,] son. I don't know the answer, you tell me. Was that your understanding?" Shields

answered, "Yes." Lacer asked Shields, "Were you going to make the announcement that you wanted the money from the man?" Shields answered, "Yes."

Madarang asked both Castille and Shields who walked into the market first. When Shields's answer was inaudible, the officer asked, "Okay, you did or didn't?" and Shields answered, "No sir." The officer then asked Castille, "Okay so, [Castille], did you walk in first then, is that correct?" Castille answered, "Yes." The officer asked Shields, "Okay but very soon after [Castille] went in, you went in? Is that correct?" Shields answered "Yes."

Madarang asked who spoke first inside the store. Shields responded, "[A]ll I remember is, I'm going to, to the door and telling [Castille] . . . come on, and he turned towards me, and he turned . . . . The man looked at it, and the man just went and grabbed his coat and pulled his . . . inaudible . . . , we trying to go, the gun popped out and . . . ." Madarang asked, "And then was there a struggle over the gun . . . ?" Shields answered, "And the man grabbed the gun, and he pulled." Madarang asked Castille, "Did the man pull at your gun at that point?" Castille answered, "Grabbed it."

Later, Madarang asked, "[Castille] you said that you think the gun might have gone off, is that correct?" Castille answered, "Yes." Madarang asked, "And then you said, you turned around and you ran after the gun fell to the ground." Castille again answered affirmatively. Madarang continued the discussion by asking Shields, "Okay, . . . what happened next, after that, after [Castille] turned and ran, and the dropped gun hit the ground?" Shields explained, "And then I said, Come on. Then he ran past me and I wanted to turn. When I went to turn and go, run right behind him, my arm hit the door and the gun went off."

Shields admitted that he approached the clerk, who had been shot, and grabbed the two guns. At no time did Shields mention pumping the weapon to chamber a round or to eject the recovered shell casing. Shields said he ran to Brown's car and threw the guns inside. Castille and Brown were already in the car. Madarang asked Brown who jumped into the car first and Brown said "Castille." Madarang said, "[T]hen [Shields] jumped in last, is that correct?" Brown said yes. Madarang said, "[Shields], you jumped in last, is that correct?" Shields said, "Yes." Madarang asked about the conversation in the car afterwards. Brown stated, "[Shields] was like, Damn why you do that?" Madarang then asked Castille, "[W]hat did you say to [Shields] when he said that to you?" Castille responded, "[I]t was like, meaning there was nothing I could say." Shields was not asked about, nor did he comment about this statement.

In response to questioning, Brown said he drove to Shields's house where Shields and Castille got out of the car. Each defendant said he went home at

that point. Madarang questioned Brown about a telephone call he received from Castille later that night. Brown said Castille sounded upset and "told me that, I mean, he went in the store and he tried to, he told the man to open the cash register. He said the man[] grabbed the gun." Brown continued, "He said the gun just went off and he dropped it and ran out the store." Lacer then asked Castille, "Is that what you told him?" Castille answered, "Yeah[,] something like that," but denied saying anything to the clerk. Castille stated that the clerk reached under the counter, Castille then threw the gun down and it discharged. Lacer replied that this explanation did not make sense. Sergeant Bingham reminded Castille that Shields described the clerk as grabbing the gun. When Bingham told Castille that the other store employee saw Castille in a "tug of war" with the gun, Castille nodded his head affirmatively. The officer asked, "So that clerk did pull that gun while it was in your hands is that correct?" Castille answered, "Yes." Lacer asked, "Did you get in a tug of war with the clerk with the gun?" Castille answered, "Well, it wasn't no, like no tug of war, cause soon as he pulled it, I let the gun go. He had the gun." Lacer asked, "Did the gun go off?" Castille replied, "I think so. I[t] was on the ground and then I was running out the store."

Brown told Madarang that he also spoke to Shields that same night. When Madarang asked what Shields said, Brown responded, "[H]e basically said the same thing [Castille] said about what happened inside." Madarang asked, "About [Castille] fighting with the guy with the shotgun?" Brown answered, "Yes." According to Brown, Shields said his own gun had discharged. Madarang then said to Shields, "Okay. [Shields], is that what happened? Uh, at some point before that's when he is talking about when you said your elbow hit the door and the gun went off?" Shields answered, "Elbow didn't hit [it], my arm hit the door, uh, as I was [turning to] go up out the store cause I had [the gun] in one hand. When it hit the thing, it went off."

Castille and Brown were questioned about the disposition of the guns, in which Shields was not involved. When Bingham asked what happened to the guns, Brown replied that the guns were given away "[t]o somebody we know." Bingham asked, "Who is we. You said, we." Brown replied, "[Castille] and I." Lacer asked, "Is that right[,] [Castille]?" and Castille answered, "Yes." Bingham asked when the guns were given away. Castille replied, "I don't know. Like, like a week or two ago, hard to say." Castille discussed how he kept the guns in his room until Brown and the friend retrieved them. Later, Shields told Lacer that he had tried "to get rid of those guns so many times." When Lacer asked if he ever told anyone "that there was a murder on these guns," Shields said no. Shields then asked, "[M]ay I correct one thing[?]" Lacer replied, "Go ahead. Anything you want." Shields said he had been trying to sell the guns even before the killing.

Before concluding the interview, Lacer returned to the subject of the shooting. Lacer stated, "Okay. Now, Mr. Shields, just so I understand this, you['re] telling us that after the clerk had, had grabbed the gun, when you backed up, that's when the gun went off . . . ." Shields answered, "When I went to turn, to leave out, and my arm hit the thing and went off. . . . I don't know what happened. . . . I knew the gun went off but . . . ." Lacer stated, "[I]f the man was hit in the head the gun was pointed at his head right?" Shields responded, "I, I raise my arm. I raise my arm and the gun went off." When Lacer asked Shields whether he ever pointed the gun at the clerk, Shields answered, "I, I don't remember." Shields claimed he hid his gun as he entered the store so that the clerks were unable to see it. Sergeant Bingham told Shields, "[The other clerk in the store] said you had that shotgun with two hands, [Shields.] And . . . you held it at port-arms which is like this. Is that right? Did you even hold a shotgun that night at any time when you went in the store with your hands like this?" Shields answered, "I don't remember." Bingham stated, "You may have?" Shields replied, "Yes but I don't remember."

After further discussion with Shields, Lacer turned his questioning to Castille, who stated, "Like I said, I was right there by the cash register and like, [Shields] was like come on [inaudible]. And I looked back at him, dude grabbed the gun I remember, I don't know, and, um, I let the gun go and I see [Shields]. . . ." Lacer asked, "Okay so you['re] sure [Shields] has the gun up like he'd have it at his shoulder, like somebody with a uh . . ." Castille responded, "You know what I am saying. If I wouldn't have ducked, it would have hit me. The bullet would have hit me. You know what I am saying, so I would have been laying down there dead right now." Lacer asked, "So [Shields] was right close to you and right close to the clerk?" Castille answered, "Yeah." Castille said he looked up and saw the barrel of Shields's gun, threw his own gun down, ducked and ran from the store. Lacer then asked Shields, "[D]o you remember the gun being that close to the clerk?" Shields said no, because he was standing by the door.

Bingham told Shields that his story was inconsistent with the trajectory of the bullet. Bingham stated, "And you heard this clerk was hit in the head. You heard [Castille] over here say that when he turned around that gun was next to his head." Bingham asked Castille, "And that gun was up to your head?" Castille answered, "Yeah." Bingham asked, "[H]ow far was . . . the end of the gun from your head when you looked?" Castille described a distance of seven feet. The joint interview continued as follows:

"[CASTILLE:] Yeah and like I was like right here and then . . . the clerk dude had the gun and everything. [Shields] was like come on, so I let the gun go. I look at [Shields] and I see the gun pointing right at me so I'm like dang,

if he pull the trigger it's going to hit me in my head. So I ducked and ran out the store. As soon as I ducked, the shot went off.

"[BINGHAM:] Was he holding the gun with one or two hands?

"[CASTILLE:] Two hands.

"[BINGHAM:] Two hands? He had the rifle up by his face, the shotgun up by his face aiming. Was there any question in your mind which direction he was aiming it?

"[CASTILLE:] I just looked up and seen it.

"[BINGHAM:] Which, which direction was he aiming?

"[CASTILLE:] Like pointing towards, pointing towards me and the clerk.

"[BINGHAM:] Okay [Shields], you just heard what he said.

"[SHIELDS:] Yes.

"[BINGHAM:] Is what he said true? [Shields], I know it's hard but you need to answer me son. Is what [Castille] just said true?

"[SHIELDS:] If he say it's true, it's true.

"[BINGHAM:] If he says it's true, it's true. That's your answer?

"[SHIELDS:] I know. You know, I don't know for a fact though, I probably did, but I know when I went to turn and walk out the store the gun went off. I know that. I know that. I can remember that. I, I won't ever forget that."

Madarang then asked Brown how many shots he heard. Brown replied that he heard only two shots.

Finally, at the conclusion of the interview, each defendant was asked if he wanted to add anything. Brown and Castille declined the opportunity. Shields added his apology to "the wife, and to the baby kids" and said that if there was anything he could do to change what had happened he would. Each defendant was also asked whether he agreed with everything that had been discussed in the interview. Castille was asked: "[D]id you understand everything we talked about here, and do you agree with everything we talked about?" Castille answered, "Yes." Shields was asked, "[D]o you . . .

understand and agree with . . . everything we have talked about here?" Shields answered, "Yes." Brown was asked the same questions and answered affirmatively.

During this process, Shields either stated himself, or explicitly agreed with the statement of someone else relating the following facts. Shields, Castille and Brown talked about robbing the business. Shields retrieved the guns, loaded them, and placed them in Brown's car. Shields rode with Castille and Brown to the location, directing Brown to make a U-turn in front of the market. Shields, wearing a ski mask, pulled something over his head before entering the store, and gave one of the guns to Castille. Shields entered the store, intending to rob it. Either before or after the clerk struggled over Castille's gun, Shields told Castille to "come on." As Castille left the market, Shields turned to leave. His arm hit the door and his gun discharged. Shields retrieved both guns from the store, threw them in the waiting car and fled with Brown and Castille.

Likewise, Castille either stated himself, or explicitly agreed with the statement of someone as follows. Along with Shields and Brown, Castille planned to rob the market. Castille got out of the car wearing a ski mask and pulled his jacket hood over his head. He took the shotgun from Shields, entered the store, and approached the clerk. The clerk grabbed Castille's gun. Castille let go of the gun; it fell to the floor and may have fired. Castille turned and saw Shields pointing his shotgun at the clerk. Fearing he might be shot, Castille ducked and ran from the store. He fled with Shields and Brown and hid the guns. Several weeks later he and Brown gave the guns to a friend.

None of the defendants contradicted these admissions at trial. The admissions and other evidence clearly establish beyond a reasonable doubt that each appellant is guilty of first degree murder on a felony-murder theory.

### B. *Applicable Hearsay Exceptions*

The statements related above fall under long-standing and closely related exceptions to the hearsay rule: statements of a party and adoptive admissions.

■ The statement of a party[3] is the most straightforward of the hearsay exceptions. Simply stated, and as a general rule, if a party to a proceeding has made an out-of-court statement that is relevant and not excludable under Evidence Code section 352, the statement is admissible against that party

---

[3] Evidence Code section 1220 provides in part: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, . . ."

declarant.[4] "The exception to the hearsay rule for statements of a party is sometimes referred to as the exception for *admissions* of a party. However, Evidence Code section 1220 covers all *statements* of a party, whether or not they might otherwise be characterized as admissions. [Citations.]" (*People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

█ The adoptive admissions exception[5] generally permits hearsay to be admitted against a party, when that party has adopted it or agreed that a statement, originally made by someone else, is true.[6] The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence, equivocal or evasive conduct. "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.)

█ Admissibility of an adoptive admission is appropriate when " 'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969], quoting *People v. Preston* (1973) 9 Cal.3d 308, 313–314 [107 Cal.Rptr. 300, 508 P.2d 300].) "There are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief* in, the truth of such hearsay statement.' [Citation.]" (*People v. Silva* (1988) 45 Cal.3d 604, 623 [247 Cal.Rptr. 573, 754 P.2d 1070].) The analytical basis for this exception is that the adopting party makes the statement his own by admitting its truth. The statement or conduct of the adopting party thus expresses the same statement made by the declarant. (See 1 Witkin, Cal. Evidence (4th ed.) Hearsay, § 102, p. 805.)

### C. *The Application of* Crawford v. Washington *and the* Aranda/Bruton *Rule*

In our original opinion, we applied the analysis from *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] (*Roberts*), in which the

---

[4] We do not further consider other possible bases for exclusion involving problems with privileges, double hearsay, speculation and the like, which are not involved here.

[5] Evidence Code section 1221.

[6] Again, we do not further consider other possible reasons for exclusion not raised by the facts here.

United States Supreme Court held that statements of unavailable declarants must bear some indicia of reliability in order to satisfy the confrontation clause. (*Id.* at p. 65.) We determined that defendants' statements were either admissions or adoptive admissions, falling under firmly established hearsay exceptions. Thus, reliability was inferred, and the confrontation clause was not violated. (See *id.* at p. 66.)

In *Crawford*, the United States Supreme Court repudiated the *Roberts* test. The *Crawford* court held that the Sixth Amendment demands nothing less than "unavailability [of the declarant] and a prior opportunity for cross-examination" before testimonial hearsay statements may be admitted against a defendant in a criminal trial. (*Crawford, supra,* 541 U.S. at p. 68.)

In view of the Supreme Court's remand of this matter, we reconsider the admission of the joint statement in light of *Crawford* as well as *Bruton* and *Aranda.*

## 1. *Express Adoptive Admissions*

■ The California Supreme Court recently ruled that adoptive admissions, elicited during a joint police interrogation, do not implicate the Sixth Amendment and thus do not constitute *Crawford* error. In *People v. Combs* (2004) 34 Cal.4th 821 [22 Cal.Rptr.3d 61, 101 P.3d 1007] (*Combs*), Michael Stephen Combs and Cynthia Purcell, were charged with murder and tried separately. During the investigation, Combs confessed. Thereafter, he and Purcell reenacted the crime on videotape. Combs demonstrated how he choked the victim and essentially repeated his earlier confession. Purcell confirmed many of Combs's statements. (*Id.* at p. 833.)

Combs argued that the majority of Purcell's statements shifted blame to him, minimizing her own role. As a result, he claimed Purcell's statements were unreliable and violated his confrontation rights. (*Combs, supra,* 34 Cal.4th at p. 841.) In a pre-*Crawford* ruling, the trial court applied the *Roberts* test. It found Purcell's statements were reliable either because they were statements against her penal interest or merely confirmed Combs's own incriminating statements. (*Id.* at pp. 841–842.)

The Supreme Court applied the newly enunciated *Crawford* principles and determined that Combs had admitted the truth of Purcell's statements by adopting them as his own: "Purcell said nothing incriminating that defendant himself had not already admitted. After Purcell corroborated defendant's prior admissions, he never retracted them; thus, he continued to acknowledge the truth of Purcell's statements. Under these circumstances, her statements

inculpating defendant during the joint interview qualify as adoptive admissions." (*Combs, supra,* 34 Cal.4th at p. 843.) Outside the defendant's presence, Purcell made additional incriminating statements, which the defendant later confirmed, thus expressly adopting those statements. (*Ibid.*)

The California Supreme Court observed that Purcell's statements were properly admitted for a nonhearsay purpose, "to supply meaning to defendant's conduct or silence in the face of Purcell's accusatory statements," and thus did not implicate the Sixth Amendment. (*Combs, supra,* 34 Cal.4th at p. 842.) The *Combs* court quoted *People v. Silva, supra,* 45 Cal.3d at page 624: "[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions* . . . . [Citation.] Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant."

Appellants argue that *Combs* is distinguishable because Purcell and the defendant were tried separately. They argue that adoptive admissions are not properly admitted in a joint trial, because admission of the codefendant's statement, necessary to establish the content of the adoptive admission, runs afoul of the *Aranda/Bruton* rule. This rule addresses the situation in which a codefendant's out-of-court confession incriminates not only himself, but also another defendant. (*People v. Brown* (2003) 31 Cal.4th 518, 537 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) When such a confession is introduced at a joint trial, the defendant is deprived of his Sixth Amendment confrontation clause rights, even when the jury is instructed to consider the confession only as to the codefendant. (*Bruton, supra,* 391 U.S. at pp. 127–128.)

■ Appellants acknowledge that during the joint interview each made direct admissions that were clearly admissible against himself. However, some of those same admissions implicated the other defendants. Appellants claim that, in a joint trial, a conflict with *Aranda* and *Bruton* necessarily arises when a codefendant's statement is offered to establish an adoptive admission. Appellants misapply the law. In such a situation, the statement of defendant A implicating defendant B is admitted not for its truth, but to supply meaning to B's response adopting A's statement as his own. Here, the court properly instructed the jury with CALJIC No. 2.71.5, providing in part: "Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the . . . conduct of the accused in the face of it."[7]

---

[7] The full text of the instruction provided the jury was as follows: "If you should find from the evidence that there was an occasion when a defendant, one, under conditions which reasonably afforded him an opportunity to reply, two, failed to make a denial or made false, evasive or contradictory statements in the face of an accusation expressed directly to him or in

Appellants rely on *People v. Jennings* (2003) 112 Cal.App.4th 459 [5 Cal.Rptr.3d 243] (*Jennings*) to challenge the propriety of CALJIC No. 2.71.5 in view of the *Aranda/Bruton* rule. Defendant Jennings was charged with murdering her five-year-old son, and was tried jointly with the child's father for that crime. During the course of the investigation, Jennings and the father were questioned together during a videotaped interrogation that was played for the jury. During the interview the father accused Jennings of repeatedly beating the child and of being more abusive than he had been. Jennings said the father was lying and denied the accusations. During the interview, after Jennings begged the father "not to do this to her," the father admitted he was the primary abuser. (*Jennings*, at p. 466.) The father accused Jennings of talking with him about killing the child and of looking for a place to dump the body. Again, Jennings denied the accusations, saying she *never wanted to kill* the boy. When she denied looking for a dumping site, the father agreed that Jennings did not know that he was looking for such a location. (*Id.* at p. 467.) The father told police that Jennings dug the hole in which the child was initially buried and that she later placed the body in a mine shaft. Jennings turned to the father and asked him "why he was doing this to her" and begged him to tell the truth. (*Ibid.*) The father eventually admitted doing those things. He made a number of other allegations about Jennings' conduct. Jennings denied them and the father subsequently admitted they were untrue.

Despite Jennings's repeated denials and objections to the father's statements about her conduct, and in spite of father's repeated admissions of falsehood, the trial court admitted the videotape at the joint trial of Jennings and the father. During the interview the father made several other potentially damaging statements about Jennings. In the face of these statements, Jennings was silent. The *Jennings* court ruled that her silence did not constitute adoptive admissions of the father's accusatory statements, and that the statements should not have been admitted. (*Jennings, supra*, 112 Cal.App.4th at p. 473.)

*Jennings* does not assist appellants here. The *Jennings* court agreed with the premise of *Castille I*. (*Jennings, supra*, 112 Cal.App.4th at p. 472.) It declined, however, to extend its analysis to "adoptive admissions arising from equivocal conduct, *such as defendant's silence in this case.*" (*Ibid.*, italics added.) Jennings repeatedly denied statements made against her, but in a few

his presence, charging him with the crime for which the defendant is now on trial or tending to connect him with its commission; three, he heard the accusation and understood its nature, then the circumstances of the silence and/or conduct on that occasion may be considered against him as indicating an admission that the accusation thus made is true. [¶] Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and/or conduct of the accused in the face of it. Unless you find that the defendant's silence and/or conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement." (See CALJIC No. 2.71.5 (6th ed. 1996).)

instances her silence, along with the father's accusations, were offered as adoptive admissions. While the *Jennings* court made several references to equivocal conduct, it actually dealt with the efficacy of silence as an adoption. The court considered in detail the inherent difficulty of analyzing silence during a custodial interrogation after a defendant has been given *Miranda* warnings. Its references to equivocal conduct other than silence are dicta. We need not comment further on the *Jennings* analysis in this regard, other than to observe that it deals with an issue not involved in the case before us. We decline to extend its reasoning to this case, which does not involve silence.

It should also be noted that *Jennings* predated *Combs*. In *Combs*, the Supreme Court ruled that a declarant's statements may properly be brought before a jury "to supply meaning to defendant's *conduct or silence* in the face of [the accusation]." (*Combs, supra,* 34 Cal.4th at p. 842, italics added.) This more recent Supreme Court authority casts doubt on *Jennings*'s continued viability on this point.

The *Jennings* court went on to criticize the procedure set out in CALJIC No. 2.71.5, which "permit[s] the jury to decide whether equivocal conduct, such as silence, constitutes an adoptive admission." (*Jennings, supra,* 112 Cal.App.4th at p. 474.) In their view, the procedure "only exacerbates the *Aranda/Bruton* problem presented [in] this case. . . . *Aranda* and *Bruton* were based on the conclusion that statements by codefendants are so inherently persuasive that a jury cannot be trusted to ignore them, even when specifically instructed to do so: The proverbial bell that cannot be unrung. Allowing a jury to decide whether silence constitutes an adoptive admission presumes that the bell can be unrung in direct contravention of *Aranda* and *Bruton*. Worse yet, the jury is instructed that the bell need not be unrung so long as the jury decides that the silence was an adoptive admission. A jury that is incapable of ignoring codefendant statements when specifically instructed to do so, is certainly incapable of properly applying the adoptive admissions rule to such statements. The inherent persuasiveness of such statements make it far too tempting to find an adoptive admission even where there is none. . . . [E]ven if the jury determines that there was no adoptive admission, it is again asked to disregard the underlying statements, bringing us full circle back to trying to unring the bell that *Aranda* and *Bruton* say cannot be unrung." (*Ibid.*)

Appellants argue that while *Jennings* limited its analysis to equivocal conduct such as silence, its reasoning is equally applicable even to express adoptive admissions. Such an extension of *Jennings* is certainly not merited. If a defendant has expressly adopted the codefendant's statement, then the jury is not faced with a "proverbial bell that cannot be unrung." (*Jennings, supra,* 112 Cal.App.4th at p. 474.) Here, for example, Shields was asked to

describe the gun he gave to Castille. Shields responded that the gun was a 16-gauge. Lacer asked, "Okay. And, Mr. Castille, is that correct, is that the kind of gun you got?" Castille answered, "Yes." In these instances, when the appellant unequivocally confirmed his codefendant's statement, the question of ambiguous post-*Miranda* silence was not a factor.

### 2. *Implicit Adoptive Admission*

Castille's statements that Shields pointed the gun at the clerk require separate analysis. There is no question that Shields heard and understood Castille to say Shields pointed the gun at the clerk. When asked directly whether Castille's recitation was true, Shields replied, "If [Castille] says it's true, it's true," and "I probably did." However, he then stated, "[B]ut I know when I went to turn and walk out the store the gun went off." Unlike the express confirmations, however, Shields's responses were equivocal. Instructed with CALJIC No. 2.71.5, the jury was called upon to decide whether Shields admitted pointing the gun at the clerk.

Appellants would have us extend the *Jennings* reasoning to Shields's responses, but we decline to do so. Unlike the situation in *Jennings*, Shields did not remain silent in the face of Castille's statements. His response is not free from ambiguity. However, permitting the jury to interpret his words, as juries are regularly called upon to do, presents no threat of compromising his constitutional right to silence. As a result, we need not further discuss the *Jennings* criticism of the CALJIC 2.71.5 procedure. We do note that if the *Jennings*'s analysis were read to prohibit the jury from determining whether an equivocal statement constitutes an adoption, the interpretation would swallow the adoptive admission rule in all but the most definitive and explicit cases of adoption. The complete scope of the rule is a question beyond our inquiry here, but we are not persuaded that, in this joint trial, it was error to admit Castille's statement that Shields pointed the gun at the clerk.

Even assuming arguendo that the question of whether Shields's responses should not have been left for the jury applying CALJIC No. 2.71.5, the error, if any, was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) Castille's description of events suggests that Shields intentionally shot the clerk. Shields, on the other hand, related that the shooting was accidental.

Shields's claim of accident is substantially at odds with the other uncontradicted facts. A great deal of evidence supports a conclusion that the shooting was intentional. Eyewitness testimony and the physical evidence indicate that Shields fired directly at the clerk, with the barrel positioned above the entry wound and aiming slightly downward. Nabil Abdullah, the other clerk in the

store, testified that two men entered the store carrying shotguns. One approached the victim Nashar, who struggled with him over the gun. The other man stayed at the door. Abdullah testified the man by the door pointed his gun into the interior of the store. Although Abdullah could not remember if the gun was pointed at the victim or elsewhere, he stated, "[H]e was definitely pointing it toward the inside." Abdullah then hid behind the refrigerator and heard two shots, six or seven seconds apart. Shields stood at the door six to eight feet from the counter, which was protected by a plexiglass screen. The discharge of his shotgun required a five-pound trigger pull. The trajectory of the shot from Shields's gun indicates it traveled at a declining angle. It pierced the plexiglass and struck the clerk, who was five feet three inches tall. The pathologist testified that the gunshot entered the left side of Nashar's head, adjacent to the lip, and emerged from the right side of his neck, declining at a 30-degree angle. The slug then became embedded in the wall behind the counter at a height of four feet 10 inches. A police technician testified that the slug's initial hole in the plexiglass and its final resting spot in the wall were aligned.

■ Moreover, even crediting Shields's account of an accidental shooting, the evidence is sufficient to support the first degree murder and felony-murder special circumstance findings. Pursuant to Penal Code section 190.2, subdivision (a), "[t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true: [¶] . . . [¶] (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of . . . the following felonies: [¶] (A) Robbery in violation of Section 211 or 212.5." As to the actual killer, intent to kill is not an element of a felony-murder special circumstance. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1088 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823 & fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)

■ Here, Shields admitted that his gun discharged and the physical evidence indicated that the clerk was killed by a slug from Shields's weapon. The jury was not required to find that he harbored an intent to kill. (*People v. Bonin* (1989) 47 Cal.3d 808, 850 [254 Cal.Rptr. 298, 765 P.2d 460].) The jury was properly instructed as follows: "If you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true." Once it is shown that the defendant committed one of the enumerated

felonies and the felony was not merely incidental to the killing, "[h]ow that killing occurred and whether it was intentional are irrelevant." *(People v. Smithson* (2000) 79 Cal.App.4th 480, 502 [94 Cal.Rptr.2d 170].)[8]

Shields argues that admission of the challenged portion of Castille's statement requires reversal of his firearm use enhancement. The trial court informed the jury that "[t]he term personally used a firearm as used in this instruction means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it or intentionally struck or hit a human being with it." Even assuming arguendo that the shooting was accidental, there was ample evidence from which the jury could have concluded that Shields intentionally displayed the firearm in a menacing manner. When Lacer asked why he carried the gun into the store, Shields answered, "To go up in there to rob." The other store clerk saw Shields point the gun into the store after entering. Any error was harmless.

### D. *Additional Arguments*

 Shields argues that the joint statement was actually a "rotating three-way interview," resulting in three separate statements that interlocked on certain points, analogous to the interlocking confessions addressed in *Cruz v. New York* (1987) 481 U.S. 186 [95 L.Ed.2d 162, 107 S.Ct. 1714] and *Lee v. Illinois* (1986) 476 U.S. 530 [90 L.Ed.2d 514, 106 S.Ct. 2056]. In *Cruz,* the Supreme Court rejected several lower courts' attempts to create an "interlocking confession" exception to *Bruton,* whereby a nontestifying codefendant's confession that implicated the defendant could be admitted if it "interlocked," or was factually consistent with, the defendant's own confession. *(Cruz, supra,* pp. 191–192.) Shields's attempts to bring his case under the *Cruz* rule fails. His statements were properly admitted because they were his own admissions. The concept of "interlocking confessions" was used in *Cruz* and *Lee* to describe the confessions of defendants giving separate statements, during separate, individual interviews. This is not what occurred here.

---

[8] The finding of the robbery-murder special circumstance as to Castille also stands. The jury was instructed: "If you find that the defendant was not the actual killer of a human being . . . , you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, or assisted any actor in the commission of the murder in the first degree *or with reckless indifference to human life and as a major participant, aided, abetted or assisted in the commission of the crime of robbery or attempted robbery which resulted in the death of a human being, namely, Abdo Nashar."* (Italics added.) The prosecutor argued only that Castille was a major participant in the robbery and acted with reckless indifference to human life. Substantial evidence supports the jury's finding of the special circumstance in Castille's case.

Appellants also point out that there were some statements made by one defendant that were not adopted by one or both of the others. For example, Brown stated that it was probably Shields who initiated the discussion of the robbery, but Shields could not remember that fact. Brown stated that, after returning to the car, Shields asked Castille, "[D]amn why you do that?" Shields was not asked to confirm Brown's statement. Shields also said he did not recall removing the guns from Brown's car afterwards or later bringing them to Castille's home, as Brown and Castille recounted. These statements constituted inadmissible hearsay to the extent they were received against and implicated a nondeclarant defendant. As such, these nonadopted hearsay statements ran afoul of the rulings in *Crawford*, *Aranda* and *Bruton*. As we have explained in detail, however, receipt of these statements is harmless in light of appellants' critical admissions regarding the attempted robbery and murder.

Finally, Shields complains that Castille and Brown did not corroborate certain of his statements indicating he lacked the intent to rob. Particularly, Shields refers to his statement, "I knew deep down in my heart at some point we was going to turn back . . . ." He points out that Castille and Brown "said nothing about this." Their failure to comment is not surprising. They could not have known about Shields's purported yet unexpressed belief. Further, neither defendant contradicted Shields. Castille and Brown simply did not address the issue, raising no material discrepancy. Finally, Shields cannot claim prejudice. His statement about turning back was admitted without limitation.

## II. Miranda *Violations*

Shields maintains that questioning during the joint interview should have stopped because he invoked his right to remain silent. Both appellants claim the standard *Miranda* warnings were not adequate. The claims fail.

### A. *Invocation of Right to Remain Silent*

During the joint interview, Shields explained that after his gun discharged, he approached the clerk who had been shot. According to the transcript, Shields stated, "I looked, and I looked at the cashier man and . . . ." Sergeant Madarang asked, "What did you see when you saw the cashier?" Shields asked, "Do I have to talk about this right now?" Madarang answered, "Yeah[,] I'm afraid you have to." Shields replied, "I already talked about it." Madarang then asked, "[W]as he shot? Is that what you['re] saying?" Shields answered and continued responding to questions.

Shields argues that his inquiry "do I have to talk about this right now" amounted to an invocation of his right to remain silent, requiring that the interview end. With regard to the joint statement, Shields raises this issue for the first time on appeal. He may do so if the question is purely one of law, based on undisputed facts. (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1459 [118 Cal.Rptr.2d 118].) In resolving the legal question, we consider his words in context. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

The tape recording reveals that Shields was emotional during parts of the interview, and appeared to be crying during the challenged portion of the statement. However, Shields gave no indication he actually wanted to stop the interview. He merely demonstrated his discomfort with the particular question about seeing the body of the clerk, who had been shot in the head with a large-caliber slug.

Other cases have addressed similar circumstances and concluded that no Fifth Amendment violation occurred. In *People v. Silva, supra,* 45 Cal.3d 604, 629 [247 Cal.Rptr. 573, 754 P.2d 1070], the defendant waived his *Miranda* rights and answered questions. When asked a particular question that might have placed him at the murder scene, he said, " 'I really don't want to talk about that.' " The Supreme Court rejected the defendant's argument that he had invoked his right to silence, stating, "A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' " (*Id.* at pp. 629–630.) In *People v. Hayes* (1985) 38 Cal.3d 780 [214 Cal.Rptr. 652, 699 P.2d 1259], the defendant asked, " 'Do I gotta still tell you after I admit it?' " The court held that "although he was willing to confess to these crimes he was reluctant to go into their details." An expression of such discomfort, however, did not imply an assertion of the right to remain silent. (*Id.* at p. 784.)

### B. *Adequacy of* Miranda *Warnings*

Appellants argue that the *Miranda* warnings are not adequate. They urge a rule requiring that a suspect be explicitly told that he has a continuing right to cut off questioning at any time. The United States Supreme Court articulated the *Miranda* admonitions in 1966 as a prophylactic measure to protect the Fifth and Sixth Amendment rights of those interrogated by agents

of the government. During the ensuing decades the court has considered various aspects of *Miranda*'s application in many cases. At no time has the court expanded the required warnings as appellants urge us to do. We decline the invitation to deviate from well-settled precedent.[9]

## DISPOSITION

The judgment is affirmed.

Parrilli, J., and Pollak, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 21, 2005. George, C. J., did not participate therein.

---

[9] No California case has addressed appellants' argument. While their decisions are not binding on us, a number of federal courts considering this issue have ruled that a defendant need not be informed of a right to stop questioning after it has begun. (See *United States v. Lares-Valdez* (9th Cir. 1991) 939 F.2d 688, 689; *United States v. Davis* (6th Cir. 1972) 459 F.2d 167, 168–169; *U.S. v. Alba* (D.Conn. 1990) 732 F.Supp. 306, 309–310; *Gandia v. Hoke* (E.D.N.Y. 1986) 648 F.Supp. 1425, 1432; *United States ex. rel. Feliciano v. Lane* (N.D.Ill. 1982) 548 F.Supp. 79, 81.)