Filed 2/25/14  P. v. Turner CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>RONALD TURNER,<br><br>          Defendant and Appellant. | A137727<br><br>(San Francisco County<br>Super. Ct. No. 197907) |

Defendant Ronald Turner appeals from an order committing him for an indeterminate term of confinement after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predator Act (SVPA or the Act). (Welf. & Inst. Code, § 6600 et seq.)[1] Defendant contends the court erred in admitting into evidence statements he made to an evaluator indicating that he had committed up to 14 additional rapes for which he was not apprehended. He also argues that his indeterminate commitment violates the due process, equal protection, ex post facto, and double jeopardy provisions of the state and federal Constitutions. We affirm the commitment order.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted. Section 6600, subdivision (a)(1) defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

1

## Factual and Procedural History

On May 10, 2012, the San Francisco County District Attorney filed a petition to commit defendant as an SVP. The following evidence was presented at the jury trial on the petition:

In November 2004, defendant entered a massage parlor. He agreed to pay the massage worker $50 for a massage. Once inside the room, he put his hands around the massage worker's throat and did not release the pressure until she agreed not to scream. He forced her to orally copulate him then pushed her down onto the bed and raped her. In March 2005, defendant was arrested at a different massage parlor for forced oral copulation on a second victim. Defendant was not charged in the March incident but was charged and pled guilty to one count of forced oral copulation (Pen. Code, § 288a, subd. (c)(2)) arising out of the November 2004 incident.

Drs. Craig Teofilo and Deidre D'Orazio testified for the prosecution. Dr. Teofilo, a licensed psychologist in California since 2001, was appointed by the Department of State Hospitals to evaluate defendant. Dr. Teofilo diagnosed defendant with four different disorders - - psychosis not-otherwise-specified (NOS), alcohol abuse, marijuana abuse, and antisocial personality disorder. Dr. Teofilo opined that defendant's psychotic disorder and antisocial personality disorder predisposed him to the commission of sexually violent offenses. In reaching his diagnosis, Dr. Teofilo considered the crime itself as well as statements defendant had previously made that were contained in his records. Based on his diagnosis and defendant's history, Dr. Teofilo was of the opinion that defendant met the criteria for an SVP commitment and that defendant was likely to reoffend if not kept in custody for treatment.

Dr. D'Orazio diagnosed defendant with undifferentiated schizophrenia, paraphilia NOS, cannabis dependence, alcohol dependence, and antisocial personality disorder. Dr. D'Orazio explained that there was little difference between her diagnosis of schizophrenia and Dr. Teofilo's diagnosis of a psychotic disorder NOS; both are types of

psychotic disorders. Dr. D'Orazio opined that the schizophrenia, paraphilia, and antisocial personality disorders, alone or in combination, predisposed defendant to the commission of sexually violent offenses. She also conducted a risk assessment and concluded based on that assessment, the clinical interview, and defendant's history that defendant was likely to reoffend and that he needed to be kept in a secure facility.

During the interview with Dr. D'Orazio, defendant told her that "witches" made him do sexual things. He explained that he committed sex offenses "because the people running the plant aren't human being but witches. Witches have a hard time with sex because they have penis holes above them where they don't have to smell the woman. She just comes down. The woman witches don't take baths, they smell, they're nasty. They don't do the human-type activities that humans do. They make me do sexual thing --- They make me sexual so then I have to masturbate." He continued, "One time I tried to force the massage lady to have sex with me. I had been to different massage places in the same area about ten times and paid massage ladies to have sex with me. You see, they do massage, but it is also a front for prostitution. If you show more money and ask for sex, they'll prostitute. But sometimes I didn't have the money and went there to rape." When asked how many times he went to the massage places to rape, he answered, "Maybe four or five times. This is at different massage places with different massage ladies. They caught me once before this time when I broke into a house where all the massage ladies lived. They called police. I was breaking in there to rape them but then found some money, so I was going to use it for same thing. It is always the same." Defendant also stated that he had done the same thing to "about seven" drug-addicted prostitutes: "I raped drug addicts. I would give them fake dope or trick them to get them to a secluded area. I never killed any of them, just gave them concise threats like, you want me to beat your ass? You want to die?" Defendant also told Dr. D'Orazio that, although he did not want to, he thought he would rape again. He explained, "Would I rape them again? Of course, I would. There's no doubt about it. I would. But do I will it? No."

Dr. Denise Kellaher testified for the defense. She opined that defendant suffered from psychosis NOS and Asperger's disorder. She explained that Asperger's is a form of autism and that such a diagnosis would explain much of defendant's behavior. According to Dr. Kellaher, there was no research to indicate that individuals suffering from Asperger's or schizophrenia will commit sexually violent acts. Dr. Kellaher concluded that defendant was not likely to reoffend in a sexually violent predatory manner based on those diagnosed mental disorders.She believed that he would be amenable to voluntary treatment if released from custody.   Dr. Kellaher also discounted defendant's statements to Dr. D'Orazio about his prior sexual offenses and his statement that he would rape again, in part because she believed that defendant did not understand Dr. D'Orazio's questions, which would be consistent with a diagnosis of Asperger's.

Dr. Garrett Essres testified for the prosecution in rebuttal. Dr. Essres diagnosed appellant with schizophrenia, alcohol dependence, cannabis abuse, and antisocial personality disorder, which together and separately predispose him to the commission of sexually violent offenses.~ (8 RT 627.)~ Dr. Essres rejected the Asperger's diagnosis on the ground that an Asperger's diagnosis would not account for many of defendant's hallucinations and delusions.

The jury found that defendant is an SVP. The trial court committed defendant to Coalinga State Hospital for an indeterminate length of time.

**Discussion**

1.  *The trial court did not err in admitting defendant's statements regarding his commission of 14 prior, uncharged rapes.*

Over defendant's objection, the trial court admitted under Evidence Code section 1220,[2] defendant's statements to Dr. D'Orazio that he had committed up to 14 uncharged

---

[2] Evidence Code section 1220 provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

4

rapes. In closing argument, the prosecution relied on these statements to argue that defendant was a serial rapist. The prosecutor told the jury that "over and over again, this man rapes because of his delusional thinking" and that defendant's statements could be taken as the truth that "he has raped and raped repeatedly, [and] that he has done so because of this disorder . . . ."

Defendant contends the court abused its discretion by admitting defendant's statements regarding the prior uncharged rapes because his statements are inherently unreliable. He acknowledges that his statements were not made inadmissible by the hearsay rule because they were party admissions, but argues that the court nonetheless abused its discretion in failing to exclude the statements under Evidence Code section 352. (See *People v. Castille* (2005) 129 Cal.App.4th 863, 875 ["The statement of a party is the most straightforward of the hearsay exceptions. Simply stated, and as a general rule, if a party to a proceeding has made an out-of-court statement that is relevant and not excludable under Evidence Code section 352, the statement is admissible against that party declarant" (fns. omitted)].) Defense counsel cites evidence suggesting that defendant was delusional at the time that he made the statements, notes that no independent evidence of the crimes was presented, and argues that considering that defendant's opportunities to commit these crimes is severely limited because he has been incarcerated on and off for much of his life.[3] He argues that the admission of 14 rapes by

_____

[3] Defendant's opening brief on appeal provides the following chronology of his incarceration during the time period in which the alleged rapes occurred: "In his statement, appellant told Dr. D'Orazio that he perpetrated his first rape when he was 13 or 14 years old, shortly after being released from [California Youth Authority (CYA)]. Appellant was born in 1980. From June 1, 1994 until July 8, 1995, he was in the custody of the [CYA] for auto theft. Two weeks after being released, on July 24, 1995, appellant was arrested, and then arrested again on August 24, 1995. He was sent first to juvenile hall and then, on May 9, 1996, to CYA, this time for car jacking. Although his release date is unclear, he received disciplinary write-ups at CYA until December of 2002. Before and after CYA commitments, appellant was placed at group homes and spent time in juvenile hall. [¶] On February 24, 2004, appellant was arrested for assault. The case

5

a psychotic man during a psychotic episode when there is no evidence that the rapes actually occurred presents grave danger of misleading the jury and has little to no probative value.

Contrary to defendant's argument, the evidence was highly relevant. Defendant's statements provided probative evidence that his crimes were caused by his mental illness and that he was largely unable to control his behavior in this regard. His statements were also evidence that he had in fact committed other unreported sex crimes. To the extent that defense counsel did not believe the statements were credible, he was free to, and in fact did, cross-examine Dr. D'Orazio and present expert testimony challenging the reliability of the circumstances under which the statements were made.[4] The trial court reasonably concluded that the issues affecting the credibility of the defendant's statements could be considered and weighed by the jury without undue confusion or prejudice. Accordingly, we find no error in the admission of this evidence.[5]

---

was 'deferred for revocation of parole.' On December 15, 2004, appellant was arrested for burglary, spent 61 days in custody and was placed on probation. On March 18, 2005, he was arrested on the predicate offense and has remained in custody since." (Record citations and footnotes removed.)

[4] Dr. D'Orazio acknowledged on cross-examination that she had not seen any independent evidence in the police reports or defendant's record corroborating the commission of the crimes. Dr. Kellaher also spent a considerable portion of her testimony identifying issues affecting the credibility of defendant's statements, including whether his Asperger's disorder may have interfered with his understanding of Dr. D'Orazio's use of the word "rape" and predisposed him to say things that are self-indicting. She noted that it is "possible that he might have [made his statements] without really truly understanding what the word 'rape' meant. Did it mean sexual contact of any sort?" She posited further that, while he may have had the intent to rape these victims, it was "unclear how often he carried it out and to what level." She also thought that defendant "would likely have gotten caught if he had that number of victims" because he "is not a sophisticated criminal offender." Finally, she emphasized that his statements were "provided only to one of the evaluators . . . [d]uring a time when he had mental status difficulties."

[5] Defendant's reliance on the policy considerations supporting the corpus delicti rule is entirely misplaced. Insofar as there was ample other evidence supporting the jury's

6

2.     *The commitment scheme under the SVPA does not violate equal protection.*

Defendant contends California's SVP law violates the equal protection clauses of the United States and California Constitutions because it treats persons committed as SVP's differently from persons committed as mentally disordered offenders (MDO) and persons found not guilty by reason of insanity (NGI). The claim of differential treatment focuses on the fact that SVP's are committed for an indeterminate term, with the burden placed on them to show they should be released after being committed, whereas MDO's and NGI's are subject to time-limited commitments in which the burden is on the People to prove that a recommitment is justified beyond a reasonable doubt.

The issues defendant raises have been decided against him by our Supreme Court in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), by this court, and by other Courts of Appeal. (See *People v. McKee* (2012) 207 Cal.App.4th 1325, 1330–1331 (*McKee II*); *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1376-1382; *People v. Landau* (2013) 214 Cal.App.4th 1, 47-48; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864.) Defendant acknowledges that the appellate decisions uniformly have adopted and supported the conclusion reached in *McKee II*. He argues nonetheless that this court should not accept the conclusions reached in *McKee II* because the court in *McKee II* failed to properly conduct a de novo review, failed to properly apply the strict scrutiny equal protection analysis, and the facts it relied upon did not justify the disparate treatment of SVP's. As previously explained by this court, we disagree with defendant and concur with the court's reasoning and holding in *McKee II*. (*People v. McKnight, supra*, 212 Cal.App.4th at p. 864.)

finding on each of the required elements for commitment, there is no concern that defendant's commitment was based solely on his own untested admissions.

3.   *Defendant's equal protection challenge to the release provisions of the SVPA is not ripe.*

Relying on *People v. McCloud* (2013) 213 Cal.App.4th 1076 (*McCloud*), defendant argues that his case must be remanded for an evidentiary hearing as to whether the differences between the release provisions for SVP's and MDO's are justifiable.

Under section 6608, if an SVP files a petition for conditional release or unconditional discharge without the recommendation or concurrence of the Director of State Hospitals, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).) In *McCloud*, *supra*, the court held that the defendant's argument that this provision violates equal protection was not "wholly without merit" because "[t]here may well be actual disparate treatment of similarly situated persons— and if there is disparate treatment, the state may or may not be justified in so distinguishing between persons." (213 Cal.App.4th at p. 1088.) Accordingly, the court remanded the case to the trial court "so that both parties may fully brief and argue [defendant's] claim that section 6608, subdivision (a), violates the equal protection clause." (*Ibid.*)

The Attorney General argues that whatever the merit of the equal protection claim, remand is not appropriate in this case because defendant's appeal is from a decision made under the SVPA's initial commitment procedures (§§ 6601-6604), not from a determination under the postcommitment release procedure set forth in section 6608. We agree.

It is a "well-settled rule that courts should 'avoid advisory opinions on abstract propositions of law. [Citations.]' " (*People v. Ybarra* (1988) 206 Cal.App.3d 546, 549; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1700.) To prevent advisory opinions, courts must wait until a case " 'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171.) Here,

8

the record does not reflect any action taken by defendant pursuant to section 6608. As such, we find his equal protection challenge to section 6608 unripe.[6]

4.   *An indeterminate term of commitment under the SVPA does not violate the due process clause, the ex post facto clause, or the double jeopardy clause.*

Defendant acknowledges that *McKee I, supra*, 47 Cal.4th at pp. 1188-1195, rejected the due process, double jeopardy, and ex post facto challenges he presently asserts, and that this court is bound by *McKee I.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The issues are raised, he states, solely to preserve his right to petition the California Supreme Court to change its ruling and to preserve his right to seek relief in the federal court. Therefore, no further discussion is necessary.

**Disposition**

The commitment order is affirmed.

_____
Pollak, Acting P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.

_____

[6] Insofar as the decision in *People v. McCloud, supra*, 213 Cal.App.4th 1076, contains no discussion of ripeness, it is not relevant authority on this question.